# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| TELADOC, INC., TELADOC PHYSICIANS, P.A., KYON HOOD, and EMMETTE A. CLARK, | § § § § | |
| | § | |
| Plaintiffs, | § § | Civil Action No.  1:15-cv-343 |
| v. | § § | JURY TRIAL DEMANDED |
| | § | |
| TEXAS MEDICAL BOARD, MICHAEL ARAMBULA, JULIE K. ATTEBURY, MANUEL G. GUAJARDO, JOHN R. GUERRA, J. SCOTT HOLLIDAY, MARGARET C. MCNEESE, ALLAN N. SHULKIN, ROBERT B. SIMONSON, WYNNE M. SNOOTS, PAULETTE B. SOUTHARD, KARL W. SWANN, SURENDA K. VARMA, STANLEY S. WANG, and GEORGE WILLEFORD III, individually and in their capacities as members of the Texas Medical Board, | § § § § § § § § § § § § § § § | |
| Defendants. | § | |

## COMPLAINT

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................ 2

II.    The PARTIES ............................................................................................................. 5

  A.   Plaintiffs ............................................................................................................... 5

  B.   Defendants ............................................................................................................ 6

III.   JURISDICTION AND VENUE .............................................................................. 7

IV.    RELEVANT MARKETS ......................................................................................... 8

V.     ADDITIONAL FACTUAL ALLEGATIONS ......................................................... 9

  A.   Patients' Use of Telehealth .................................................................................. 9

  B.   Teladoc's Clients ................................................................................................ 12

  C.   Teladoc's Physicians .......................................................................................... 15

  D.   Teladoc Consultation Process ............................................................................ 18

  E.   Dramatic Growth of Teladoc and the Telehealth Industry ................................ 21

  F.   The TMB's Anticompetitive Actions to Put Teladoc Out of Business ............ 22

      a.   Anticompetitive Amendment to Rule 174 .................................................... 23

      b.   Anticompetitive "Interpretation" of Current Rule 190.8 ............................. 24

      c.   Anticompetitive Emergency Rulemaking ..................................................... 25

      d.   Anticompetitive April 2015 Rulemaking ...................................................... 26

VI.    DEFENDANTS' CONDUCT HAS HARMED COMPETITION, COMPETITORS, AND CONSUMERS ............................................................................................... 28

  A.   New Rule 190.8 Would Harm Patients By Raising Prices And Reducing Supply of Physician Services ............................................................................................. 28

  B.   New Rule 190.8 Would Harm Public And Private Payors By Raising Prices And Reducing Choice ................................................................................................. 29

  C.   New Rule 190.8 Is Not Reasonably Necessary Or Narrowly Tailored to Any Legitimate Objective .......................................................................................... 30

  D.   New Rule 190.8 Will Cause Irreparable Harm to Plaintiffs. ............................ 31

VII.   CLAIMS FOR RELIEF ......................................................................................... 34

VIII.  APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF ......................... 35

IX.    DEMAND FOR JURY TRIAL .............................................................................. 35

X.     PRAYER FOR RELIEF ......................................................................................... 35

Plaintiffs Teladoc, Inc. and Teladoc Physicians, P.A. (collectively, "Teladoc"), Kyon Hood, M.D., and Emmette Clark, M.D. (together with Teladoc, "Plaintiffs") bring this action for injunctive relief against Defendants the Texas Medical Board and certain of its members, in their official and individual capacities (collectively, the "TMB" or "Defendants") for violations of the Sherman Act, 15 U.S.C. § 1 and the Commerce Clause, U.S. Const. Art. I, § 8, Cl. 3. Plaintiffs allege as follows:

## I.   INTRODUCTION

1.        The Supreme Court recently reaffirmed that state licensing boards made up of active members of the licensed profession, like the TMB, are not immune from the antitrust laws when they take anticompetitive actions without the active supervision of the State. That is exactly what happened here. On April 10, 2015, Defendants agreed to adopt revisions to Texas Administrative Code § 190.8(1)(L) ("New Rule 190.8") that would dramatically restrict competition from telehealth. If this new rule is permitted to take effect, it would raise prices and reduce access to physician services in Texas.

2.        Telehealth services offer patients access to highly qualified, in-state-licensed physicians through telecommunications technologies. Telehealth providers are generally available 24 hours per day, 365 days per year, for a fraction of the cost of a visit to a physician's office, urgent care center, or hospital emergency room.

3.        The TMB knowingly permitted the operation of telehealth in Texas for many years. However, starting around 2009, when telehealth providers, and in particular Teladoc, began to expand in scale, the competitive threat to traditional office- and hospital-based physicians became clear. The TMB began working to stamp out this threat to competing physicians.

4.      The TMB has taken a number of prior actions to try to block competition from Teladoc. In October 2010 the TMB adopted 22 T.A.C. §174 ("New Rule 174").  This new rule required an in-person physical examination before any consultation with a patient using video conferencing technology, which prevents Teladoc from offering Texas patients the option of video consultations.

5.      In June 2011, the TMB tried to enforce an invalid interpretation of existing Rule 190.8 in an effort to shut down Teladoc's service entirely.  The Texas Third Court of Appeals rejected this attempt, holding that the "TMB's pronouncements in its June 2011 letter are tantamount to amendments to the existing text . . . TMB's pronouncements hardly 'track' Rule 190.8 . . . rather, they depart from and effectively change that text."  Op. at 23, *Teladoc, Inc. v. Tex. Med. Bd. & Nancy Leshikar*, No. 03-13-00211-CV (Tex. Ct. App., 3d Dist. Dec. 31, 2014).

6.      In early 2015, the TMB again tried to shut down Teladoc's business, this time through an improper "emergency" rulemaking.  That action, too, was invalidated by a Texas state court, which held that "[n]o imminent peril to public health, safety or welfare . . . exists at the present time to justify adoption of the emergency rule and it is invalid."  Temp. Inj. Order ¶ 2, *Teladoc, Inc v. Tex. Med. Bd. & Scott Freshour.*, No. D-1-GN-15-000238 (Tex. Dist. Ct., Travis Cnty. Feb. 6, 2015).

7.      New Rule 190.8, adopted on April 10, 2015, is yet another attempt by the TMB to prevent competition from telehealth generally, and Teladoc in particular.  When it was originally adopted by the TMB in November 2003, Rule 190.8 did not require a face-to-face visit.  In order to prevent competition from telehealth services, however, New Rule 190.8 would add a requirement that physicians conduct an in-person physical examination of a patient before

telephonic diagnosis and treatment are allowed, regardless of whether such an examination is medically necessary under the circumstances.

8.      The TMB has claimed that the new rule mandating physical examinations regardless of medical need will promote patient safety, but this claim is unsupported and pretextual.  For many decades, physicians have used the telephone to take turns providing "on-call" coverage, diagnosing and, where appropriate, treating other physicians' patients by phone when those patients need care outside of normal business hours.  The TMB has never suggested that traditional, phone-based on-call arrangements threaten patient safety.  Through the use of modern technology and protocols, Teladoc's telehealth service is clinically superior to traditional on-call services.  For this and many other reasons, New Rule 190.8 is not reasonably necessary to accomplish any legitimate objective, nor is it reasonably tailored to do so.

9.      There is no active supervision of the TMB by any agency of the State of Texas, or by the Legislature.  No agency has the authority to veto or modify a rule promulgated by the TMB.  Nor did the State actively supervise the TMB's adoption of New Rule 190.8, even though the TMB is made up of a majority of active market participants in the profession the TMB regulates.

10.     Of the submissions made during the rulemaking proceeding, 203 out of 206 written comments (99%) opposed the rule change.  Of the three comments supporting the change, two were filed by a trade association of physicians.

11.     Despite the overwhelming opposition to the proposed new rule, Defendants approved New Rule 190.8 at a meeting on April 10, 2015, by a vote of 14 to 1.

12.     Of the 14 board members who voted in favor of the new rule, 12 are active physicians.

13.     The lone dissenter, Mr. Frank Denton, is a non-physician.  As Mr. Denton explained at the April 10 hearing, the rulemaking record for New Rule 190.8 was entirely devoid of any

COMPLAINT                                    4

evidence demonstrating a safety concern with telehealth, which was the ostensible motivation for the rule change.

14.     Following the adoption of New Rule 190.8, Mr. Bill Hammond, Chief Executive Officer of the Texas Association of Business, stated that, "[t]here's no question whatsoever" that New Rule 190.8 "is about doctors protecting other doctors' income.  It's about dollars.  It's not about better health care."

15.     Defendants have said that they plan to begin enforcing the rule on June 3, 2015.

16.     If the rule takes effect, it would reduce output and raise prices for physician services, to the detriment of the people of Texas.  It would also cause dramatic and irreparable injury to Teladoc, which will effectively be put out of business in Texas and which will find its business nationwide in jeopardy.  And the rule would cause substantial and irreparable harm to the other plaintiffs as well.

## II.  THE PARTIES

### A.  Plaintiffs

17.     Teladoc, Inc. was founded in Texas in 2002.  Its principle place of business is 4100 Spring Valley, Suite 515, Dallas, Texas 75244, and it is a privately-held Delaware corporation. Teladoc, Inc. is one of the first and largest telehealth services in the United States, and connects a network of approximately 700 board-certified, state-licensed physicians with approximately 11 million patients.

18.     Teladoc Physicians, P.A. is a Texas professional association.  The physicians of Teladoc Physicians, P.A. compose Teladoc, Inc.'s network of board-certified, Texas-licensed physicians. Teladoc Physicians, P.A. provides medical services, including writing prescriptions, to patients in Texas through Teladoc, Inc.'s telehealth service.

19.     Kyon Hood, M.D., is a Texas-licensed physician and Virginia resident, and is a member of the Teladoc Physicians, P.A. provider network.  Dr. Hood is licensed to practice medicine in twelve states, including Texas.  Dr. Hood provides telehealth consultations to Teladoc members in Texas while he is outside the state.

20.     Emmette A. Clark, M.D., is a Texas-licensed physician and Texas resident.  Dr. Clark is a member of the Teladoc Physicians, P.A. provider network and provides telehealth consultations to Teladoc members in Texas.

**B. Defendants**

21.     The TMB is an agency of the executive branch of state government with the power to regulate the practice of medicine.  3 Tex. Occupations Code § 152.001(a).  The board consists of 19 members, 12 of whom are licensed physicians.  *Id.* § 152.002.

22.     Michael Arambula, M.D., Pharm.D., is the President of the Board and a licensed physician.  Dr. Arambula voted in favor of New Rule 190.8.

23.     Manuel G. Guajardo, M.D., is a member of the Board and a licensed physician.  Dr. Guanjardo voted in favor of New Rule 190.8.

24.     John R. Guerra, D.O., is a member of the Board and a licensed physician.  Dr. Guerra voted in favor of New Rule 190.8.

25.     J. Scott Holliday, D.O., M.B.A., is a member of the Board and a licensed physician.  Dr. Holliday voted in favor of New Rule 190.8.

26.     Margaret McNeese, M.D., is a member of the Board and a licensed physician.  Dr. McNeese voted in favor of New Rule 190.8.

27.     Allan N. Shulkin, M.D., is a member of the Board and a licensed physician.  Dr. Shulkin voted in favor of New Rule 190.8.

28.     Robert B. Simonson, D.O., is a member of the Board and a licensed physician.  Dr. Simonson voted in favor of New Rule 190.8.

29.     Wynne M. Snoots, M.D., is a member of the Board and a licensed physician.  Dr. Snoots voted in favor of New Rule 190.8.

30.     Karl Swann, M.D. is a member of the Board and a licensed physician.  Dr. Swann voted in favor of New Rule 190.8.

31.     Surendra K. Varma, M.D., is a member of the Board and a licensed physician.  Dr. Varma voted in favor of New Rule 190.8.

32.     Stanley Wang, M.D., J.D., MPH., is a member of the Board and a licensed physician.  Dr. Wang voted in favor of New Rule 190.8.

33.     George Willeford III, M.D., is a member of the Board and a licensed physician.  Dr. Willeford voted in favor of New Rule 190.8.

34.     Julie K. Attebury, M.B.A., is a member of the Board.  Ms. Attebury voted in favor of New Rule 190.8.

35.     Paulette Barker Southard is a member of the Board.  Ms. Southard voted in favor of New Rule 190.8.


### III.   JURISDICTION AND VENUE

36.     The Court has subject matter jurisdiction over Plaintiffs' Sherman Act claims.  *See* 28 U.S.C. § 1337(a); *see also id*. § 1331.

37.     The Court has jurisdiction to award damages under Clayton Act § 4 and to render injunctive relief under Clayton Act § 16.  *See* 15 U.S.C. §§ 15, 26.

38.     The Court has subject matter jurisdiction over Plaintiffs' constitutional claims.  *See* 42 U.S.C. § 1983; 28 U.S.C. § 1331.

39.     The Court has personal jurisdiction over Defendants because they reside and regularly conduct business in Texas.

40.     Venue lies with this Court because the TMB has its principle place of business and headquarters at 333 Guadalupe, Tower 3, Suite 610, Austin, Texas 78701, and a substantial part of the events giving rise to Plaintiffs' claims occurred there.  *See* 28 U.S.C. § 1391(b)(1)&(2); 15 U.S.C. § 15(a).

## IV.   RELEVANT MARKETS

41.     Product Markets.

    a.     <u>Payor Market</u>.  Plaintiffs compete with physicians for "in-network" status with third-party payors, and compete for utilization within that network.

    b.     <u>Physician Services Market</u>.  Plaintiffs compete with other physicians in diagnosing and treating medical issues.  Plaintiffs compete with office-based physicians, urgent care center physicians, and hospital-based physicians, as well as with other telehealth services in this market.

42.     Geographic Market.  The relevant geographic market is Texas.  By law, to treat a patient in Texas, a physician must have a medical license from the TMB and abide by other TMB regulations.  *See* Tex. Occupations Code. s.155.011.  The effect of New Rule 190.8 is therefore to limit the competitive alternatives for patients who are located in Texas and payors that serve patients in Texas.

## V.   ADDITIONAL FACTUAL ALLEGATIONS

### A.  Patients' Use of Telehealth

43.     Patients typically gain access to Teladoc through their employer or another organization

that has reached an agreement with Teladoc to make the Teladoc service available to its

members in return for a low monthly per-member subscription fee.

44.     Individuals whose organizations have subscribed to Teladoc have the option of

registering with Teladoc by telephone or online, which involves providing information such as a

medical history, physician, contact information, and medical records.  Members may also upload

photographs and medical records to Teladoc's system for inclusion with their medical history.

45.     After enrolling with Teladoc, when a member needs a physician consultation, he can log

into Teladoc's web portal or call a toll-free number to place a request to speak with a board-

certified physician licensed in his state.  Typically, members receive a call back from a Teladoc

physician within 8 minutes of making a request.

46.     There are approximately 11 million Teladoc members nationwide and 2.4 million in

Texas.  These high enrollment numbers reflect the simple fact that telehealth is highly attractive

to patients for the following reasons.

      a.      Some patients prefer the privacy and convenience of talking with a doctor in their

home, rather than going to an office and spending time in a waiting room filled with

germs.

      b.      Some patients find telehealth attractive because it means that they do not need to

take time off from work or other commitments, or to travel long distances in order to

consult with a physician.

      c.      Some patients prefer telehealth because it allows them to receive treatment faster

than other alternatives.  Teladoc makes telehealth consultations available 24 hours per

day, 365 days per year.  Approximately half of Teladoc's consultations occur outside of normal business hours (one-third occur on weekends or holidays alone), when most physicians' offices are closed.

d.      Still other patients prefer telehealth because it is less expensive than the alternatives.  Teladoc's medical services are almost always more accessible and priced substantially lower than the conventional alternatives, including a trip to the emergency room or urgent-care facility, or an in-office visit, enabling both payors and clients to pay less for safe and efficient healthcare.  *See* Miller Decl. ISO Pls.' Appl. for TRO & Prelim. Inj., ¶¶ 38, 69-70.  A Teladoc consultation costs $40, whereas the average cost of a physician's office visit is $145 and an emergency room visit is $1,957.  *See id.* ¶ 69 n. 40.  These cost savings accrue very directly to patients.

e.      Not only does a Teladoc consultation cost substantially less than the alternatives, even the $40 cost of a Teladoc consultation is often split between the payor and the patient, and in many cases a Teladoc member's out-of-pocket cost is reduced to $10 or less – in some cases, a Teladoc member pays $0.  On average, Teladoc members have a co-pay of approximately $18 for a Teladoc consultation.  The average co-pay paid by a patient for a physician's office visit costs 33% more ($24), an urgent care visit costs 400% more ($102), and an emergency room visit costs 3000% more ($560).

47.   For these reasons and others, consumers are increasingly making it clear that they prefer to receive physician services on their own terms, rather than under a traditional model that requires them to book an appointment days or even weeks in the future, travel to the designated location at the scheduled time, remain in a crowded waiting room at the mercy of the physician's convenience, and pay a non-negotiable and ever-increasing price.

48.     Teladoc's customer surveys indicate that, in the absence of telehealth, 56% of patients who use Telaodc would have visited a physician's office instead, 23% would have gone to an urgent care facility, 13% would have forgone medical care entirely, and 9% would have gone to an emergency room.

49.     These numbers underscore additional benefits of allowing patients to be treated through telehealth where doing so meets the standard of care.  To take one example, for those patients with acute but non-emergency conditions who would go to emergency rooms in the absence of telehealth, there is real value in permitting the option of telehealth rather than diverting these patients to emergency rooms.  A 2012 study by the American College of Emergency Physicians found that 85% of Americans who visited the emergency room did so because they could not wait to see their regular medical provider, and more than 50% of those visits were for non-emergency issues.  Allowing patients with acute but non-emergency conditions the option of being treated through telehealth if appropriate helps to reduce emergency room backlogs, so that patients with true emergencies receive treatment faster.

50.     To take another example, for the roughly 13% of patients who would forgo care entirely in the absence of telehealth, there are obvious adverse medical consequences of a rule effectively preventing telehealth consultations.  These patients, who might forgo care because they do not believe that their condition is urgent enough to warrant paying for an in-person appointment or a trip to the emergency room, face serious and potentially even life-threatening consequences as a result of being denied treatment.  Teladoc has in fact had dramatic, real-life success in helping patients in this precise situation, who called with what they thought were minor symptoms and found that their conditions were in fact more serious than they had realized.  For example, one patient did not realize he was in the beginning stages of a heart attack until he called Teladoc.

COMPLAINT                                            11

He was directed to the emergency room, where the diagnosis was confirmed.  The patient reported that he would not have sought emergency care had he not spoken to a Teladoc provider because he did not realize the severity of his condition, but he chose to call Teladoc because doing so was so easy.  In another example, a mother contacted Teladoc after her son began experiencing a tingling sensation in his feet.  After a 45-minute consultation, the Teladoc physician advised the mother to take her son to the emergency room to rule out a few conditions, including multiple sclerosis.  Unfortunately, the multiple sclerosis diagnosis was confirmed, but access to Teladoc allowed the family to get a diagnosis sooner than they would have otherwise received it – multiple sclerosis is rare in children, and is often missed for an extended period of time.  Because of the easy accessibility of Teladoc consultations, these patients obtained timely and critical advice.

51.     In addition, even for patients who are diverted from telehealth to a traditional physician's office, these patients will face more than simply increased costs: patients will be forced to incur travel time and inconvenience as a result of the elimination of telehealth.  This in turn has real consequences, particularly in Texas, which ranks 45th among states in the availability of physicians per capita.  There are 200 counties in Texas that are medically underserved, 16 counties that have only a single physician, and 27 counties that have no physicians at all.  For patients in underserved or rural areas, being forced to make an in-person visit to a physician when this is not medically necessary under the circumstances creates a real and inappropriate burden.

### B.  Teladoc's Clients

52.     Teladoc works with employers, health plans, hospital systems, and other organizations to make its services available to their members.

53.     For example, more than 1,600 employers partner with Teladoc to provide telehealth services to their employees, including 160 "Fortune 1000" companies such as AT&T, Bank of America, Costco, Dow Chemical, General Mills, Halliburton, Lockheed Martin, MetroPCS, and Shell.

54.     Teladoc provides services to approximately twenty health plans, including Aetna, Blue Shield of California, Highmark, and Centene.

55.     Prominent hospitals, such as Memorial Hermann Hospital System in Houston, Beth Israel in New York, and Henry Ford Health System in Michigan, contract with Teladoc to provide telehealth services to their patients.  Beth Israel, for example, supplements its own hospital-based physicians with Teladoc physicians to provide medical services to its patients by telephone. Beth Israel patients can request a telehealth consultation, which goes first to a pool of Beth Israel physicians using the Teladoc platform, and if they are unable to take the consult within five minutes, then it is passed to the general Teladoc provider network.  Partnership with Teladoc ensures that Beth Israel patients have convenient access to high quality medical care.  Henry Ford has a similar arrangement.

56.     All of these clients are highly sophisticated, and conduct careful examinations of the quality of Teladoc's healthcare services before deciding to subscribe to Teladoc for the benefit of their employees, and the fact that major clients and hospital systems have decided to use Teladoc is an important endorsement of Teladoc's high quality.

57.     In addition to these private companies, Teladoc's clients also include government and public sector entities.  Hundreds of government entities in Texas partner with Teladoc, including cities, counties, and school systems, along with the Texas Teachers Retirement System.

Children in foster care for the Texas Health and Human Services Commission also have access to Teladoc.

58.     Medicare and Medicaid users nationwide also use Teladoc.  Approximately 800,000 members of Texas State Medicaid managed care population and approximately 25,000 individuals within the Medicare population in Texas are Teladoc members.

59.     Associations also provide access to Teladoc's service on behalf of their members.  For instance, the National Rifle Association offers Teladoc benefits to its members.

60.     Last but not least, Teladoc provides services to more than one thousand small businesses, including 300 small businesses in Texas.

61.     In total, Teladoc now offers telehealth consultations to the members of more than 4,000 organizations nationwide.  Most prospective Teladoc clients with national footprints place a very high value on Teladoc's nationwide coverage, and want to ensure that their members in every state will be able to use Teladoc's services

62.     Teladoc's revenue comes primarily from nominal monthly per-member subscription fees that Teladoc charges to these clients.  In the aggregate, subscription fees account for 85% of Teladoc's revenue, and consultation fees account for the remaining 15%.

63.     Teladoc provides tremendous value to clients by providing high quality care to their members at reduced cost.  One study conducted by a Harvard professor regarding the use of Teladoc by a major home improvement retailer, for example, showed substantial cost savings of a Teladoc consultation compared to the alternatives.  Not only is the initial $40 Teladoc consultation less expensive than an in-office or emergency room visit, the study found that the average "all-in" 30-day cost-savings of Teladoc consultations was even greater.  By analyzing similarly-situated patients with similar diagnoses, the study found that patients required more

follow-up care when treated in an office or emergency room, as compared to treatment through telehealth.  The average 30-day cost savings of Teladoc was $191 compared to physician office visits and $2,661 compared to emergency room visits.  In total, the study found that the employer's average savings was $727 per consultation with Teladoc, and the client saved more than $5.4 million over the first 12 months that it offered its employees the option of Teladoc consultations.

64.     Although it was not included in the home improvement retailer case study and is more difficult to measure, Teladoc also saves money for clients by reducing lost productivity due to employees attending work while ill, as well as employees missing work due to illness.

65.     More readily accessible, inexpensive access to medical care through telehealth means that more patients receive professional medical care when they need it.  And, having health issues addressed sooner leads to healthier and more productive employees.

66.     Studies have shown that Teladoc patients generally need less follow-up care than similar patients with similar diagnoses treated in-person (e.g., at a physician's office, urgent care center, or emergency room).  Not only does this mean that Teladoc offers patients a lower total cost of care, reduced need for follow-up care is a proxy for the quality of the initial consult and this evidence thus provides further confirmation of the high quality of the Teladoc service.

67.     Not surprisingly in light of its high quality and comparatively low cost, Teladoc has a 98% client retention rate and a 95% patient satisfaction rate.

### C.  Teladoc's Physicians

68.     As noted above, Teladoc currently has approximately 700 physicians in its network. These physicians are board-certified and have an average of 20 years of practice experience. Teladoc has wait lists around the country of physicians who wish to join.  Some Teladoc providers become licensed in multiple states to facilitate their provision of telehealth services to

more consumers.  Dr. Hood, for example, became licensed in multiple states, including Texas, for the purpose of practicing telehealth.

69.     When physicians first apply to become Teladoc providers, they undergo a thorough application process and rigorous background check.  Among other things, Teladoc performs a background check that includes verification through the National Practitioner Data Bank, American Medical Association, State and Federal Boards, and other entities.  Teladoc reviews each physician for board certification, work history, peer references, state licensing, monthly state sanction reports, DEA licensing, and criminal and civil background.

70.     Once physicians join Teladoc, Teladoc provides them with specialized training in treatment and diagnosis through telehealth.

71.     To assist physicians, Teladoc convened a panel of medical experts to develop evidence-based clinical guidelines for the treatment of 104 medical conditions based on careful assessments of the existing standards of care.  These proprietary guidelines are informed by independent, third-party organizations that have adopted standards of care that allow for the remote treatment of certain conditions, such as the American Academy of Pediatrics' Pediatric Telephone Protocols.  Even conditions that have traditionally required a physical examination are increasingly susceptible to effective treatment through telehealth.  For example, the "Centor criteria" (e.g., fever, and swollen lymph nodes) can be used to treat strep throat remotely. Among the most common diagnoses made by Teladoc physicians are upper respiratory infections, bronchitis, conjunctivitis, and sinusitis, but Teladoc physicians will provide appropriate treatment for whatever symptoms the patient presents.  In 2014, Teladoc physicians treated patients for conditions varying from insomnia, food poisoning, sunburn, Lyme disease, joint pain, alcohol abuse, and asthma.  Teladoc also offers a groundbreaking smoking cessation

program and plans to expand its specialized treatment of behavioral health and dermatological issues.

72.     Teladoc has numerous quality control procedures to ensure that Teladoc physicians are providing high quality services.  Teladoc actively monitors its physician providers to ensure compliance with all relevant policies and standards of care.  For example, Teladoc conducts a quality control review of 10% of all consultations through random sampling, and each newly credentialed physician has either his first three months of consultations or his first 10 consultations reviewed.  At least one consultation chart is reviewed for each physician who performs a consultation in any month.  Teladoc also monitors prescription rates as part of this quality control process.  If patient complaints are received, Teladoc performs an audit.  When providers fail to meet Teladoc's standards, they are discharged from the network.  For its stringent quality control measures, Teladoc has earned a certification for credentialing from the National Committee for Quality Assurance.

73.     No Teladoc physician has ever been the subject of a malpractice claim over a Teladoc consultation, either in Texas or anywhere in the United States.

74.     Teladoc increases the overall supply of physician services by enabling physicians, who might otherwise retire, stay home with children, or opt out of the work force for other reasons, to continue providing their services to patients on a flexible basis.  Moreover, even physicians who keep their day jobs can use the built-in flexibility of telehealth to supplement their income and provide additional patient services at night or on the weekends.  The opportunity to expand their practice, supplement income, and help more patients also encourages Teladoc physicians to become licensed to practice medicine in more than one state, making more physicians available to patients.  By expanding the available supply of physicians services and by increasing the

COMPLAINT                                        17

utilization of well-educated physicians, prices are kept lower for consumers, and the scarcity of physicians in Texas is reduced.

75.     Teladoc's purpose-built platform also allows physicians to be, in some cases, 25% more efficient and productive than their office-based counterparts.  This efficiency allows them to spend more of their time treating patients.  In short, Teladoc gives experienced, well-qualified physicians the tools to expand their productivity, increasing the output of physician services. Increased output, in turn, lowers prices consumers pay for healthcare.

### D.  Teladoc Consultation Process

76.     In order to provide a Teladoc consultation, a Teladoc physician must log in to his Teladoc account at a computer.  Once the physician is logged in, Teladoc's Health Insurance Portability and Accountability Act-secure interface shows the physician the list of current member requests for consultation.

77.     If the Teladoc physician accepts a consultation request, the physician is presented with the member's electronic health record ("EHR") which includes the member's medical history, allergies, medications, records from prior consultations, and any photographs the member has uploaded.

78.     After reviewing the member's medical file, the Teladoc physician calls the member and initiates the consultation.  The consultation may include advice, diagnosis, and possibly a prescription for medication depending on what care is medically appropriate and warranted.  In practice, a high percentage of Teladoc consultations result in prescriptions (although still slightly lower than result from office visits).

79.     Teladoc providers write prescriptions only when a prescription is medically indicated and only within strict guidelines.  For example, antibiotics are prescribed according to guidelines from the Center for Disease Control ("CDC"), and such prescriptions are for a limited duration.

Teladoc's average prescription rate is lower than the prescription rate for in-office visits as reported by the CDC.

80.     On average, approximately 94% of Teladoc patients have their medical issues resolved by a Teladoc consultation.  The remaining 6% are referred to their physician, dentist, or emergency room.  This high success rate is due in part to a Teladoc physician's ability to issue medically-indicated prescriptions.  Consultations that cannot offer prescriptions fail to solve the vast majority of patients' issues.  In contrast to nurse advice lines, which have no prescription writing power and are thus rarely utilized,  Teladoc's utilization rate is over 10% and growing.  When the consultation is free to the patient, utilization is more than 20%.  Utilization increases the longer a payor has been a client of Teladoc.

81.     Teladoc physicians do not prescribe DEA-controlled substances (including narcotics) or what are referred to as lifestyle drugs (i.e., Viagra, or diet pills).  Teladoc physicians' ability to prescribe medications is critical to the existence of the service.  For many of the conditions handled by Teladoc physicians, doctors would not be able to treat their patients adequately if they could not offer prescriptions.

82.     If a Teladoc physician writes a prescription for a patient, that prescription is sent electronically directly to the patient's preferred pharmacy.

83.     Teladoc's board-certified, Texas-licensed, and highly experienced physicians practice in accordance with Texas' standard of care.  Thus, they will provide treatment only if treatment by telephone is appropriate, based on the individual circumstances of each consultation.  Under Teladoc's guidelines, certain situations will always result in a patient being referred to in-person treatment.  Teladoc physicians will refer a patient to in-person treatment if, for example, the patient inquires about lifestyle drugs.  They will also direct patients suffering from a medical

emergency to an emergency room.  If a Teladoc physician determines as a result of a consultation that, for any reason, treatment through telehealth is not appropriate under the circumstances, the Teladoc physician will refer the patient to a physician's or dentist's office, or to the emergency room, as appropriate.

84.     Following a consultation, the Teladoc physician updates the patient's electronic records, so that information regarding the consultation is available for the next time the patient requests a consultation.  The patient may also access or download his information at any time, and can have the information automatically forwarded to his regular physician if desired.

85.     For all of the foregoing reasons, Teladoc represents a substantial improvement over traditional "on-call" practice under which physicians take turns providing after-hours coverage for calls from their colleagues' patients.  Unlike Teladoc physicians, traditional "on-call" physicians generally do not have special training in telehealth and generally have not reviewed a patient's medical history before providing a phone consultation.  And even when on-call physicians could in theory access a patient's medical record, they do not necessarily do so.  In addition, again unlike Teladoc physicians, traditional on-call physicians do not have ready HIPAA-compliant access to recent photographs provided by the patient to assist with diagnosis, and traditional on-call physicians do not have sophisticated drug interaction software to help protect against prescribing a treatment that might create risk for a particular patient.  And, unlike Teladoc physicians, traditional on-call physicians generally are not subject to any quality control procedures.  Though the traditional on-call model lacks the safeguards and useful features of the Teladoc model, the traditional on-call model is universally recognized as being compliant with the standard of care.

86.     Teladoc's business model falls within the telehealth policies of the Federation of State Medical Boards and other respected medical associations.  That technology allows patients to upload high-resolution photographs before or during their consultation, in a HIPAA-compliant manner.  High-resolution photographs can be superior to video because they offer higher resolution and better quality.  Ultimately, as with all medical care,  the physician's medical judgment determines whether telehealth is appropriate for each individual patient based on the circumstances.

### E.  Dramatic Growth of Teladoc and the Telehealth Industry

87.     Teladoc began offering services in Texas in 2005 and, since then, it has provided more than 750,000 telehealth consultations nationwide, including more than 298,000 in 2014 alone. Teladoc's business in Texas truly began to take off in 2008 and 2009 as the company began signing major deals with payors in Texas.  Teladoc's first major deal in Texas was with Assurant, a $26-billion insurance company, in May 2008.  This deal was picked up in the trade press and marked Teladoc's first partnership with a major health plan in Texas.  Teladoc followed with a deal to serve children covered by Medicaid with Texas True Choice in October 2008, and then deals with OptumHealth in February 2009 and Amerigroup, a multi-state servicer of public health plans, in 2010.  Teladoc's membership increased by 73% from 2008 to 2010.

88.     The competitive threat posed by Teladoc has only grown since then.  In Texas alone, Teladoc membership increased 53% from 2013 to 2014, and Teladoc now has 2.4 million Texas members, including members in rural areas and areas underserved by physicians.  Nationally, Teladoc has more than doubled its client and membership base over the past two years.

89.     In 2014, Teladoc's subscription and consultation revenue from operations in Texas totaled $10 million, or 23% of Teladoc's overall revenue.  And Teladoc's <u>overall</u> 2014

subscription revenue from payors whose covered members include members in Texas was $21 million.

90.     The number of Teladoc consultations has been increasing even faster than membership growth.  From 2013 to 2014, Teladoc's number of consultations increased 163%.  In 2014, Teladoc performed more than 60,000 consultations for Texas residents alone.  Of the 700,000 consultations Teladoc provided in the past 12 years, 298,000 were conducted in 2014, and Teladoc now averages more than 1,400 consultations per day.

91.     Teladoc's explosive growth – and the dramatic growth in telehealth more generally – has been driven by the high quality and value of its telehealth service.  This is particularly important at a time when healthcare prices have steadily outpaced inflation for years, and patients are often left with fewer accessible healthcare options.

92.     This trend is predicted to continue and accelerate: A 2014 study by Towers Watson projects that 71% of employers are expected to offer telehealth by 2017, up from the 22% of businesses that offered telehealth services to their employees in 2014.

93.     Using data from the CDC, Teladoc estimates the current annual opportunity for telehealth to be $17 billion.

### F.  The TMB's Anticompetitive Actions to Put Teladoc Out of Business

94.     The TMB was made aware of Teladoc's practices at least as early as 2005, but it was not until 2009, as Teladoc's business began to grow dramatically in Texas, that the TMB began to realize the economic threat posed by telehealth.  On information and belief, the TMB acted on at least one complaint by a doctor to conduct an investigation of an individual Teladoc physician. Since that time, Defendants have taken a series of anticompetitive joint actions to try to restrict competition:

### a. Anticompetitive Amendment to Rule 174

95.    In the fall of 2009 the TMB began a rule making process to amend Rule 174 regarding telemedicine, so as to require an initial in-person meeting between a patient and physician before a patient and physician could meet using videoconferencing technology.

96.    On information and belief, during the late 2009 and early 2010 meetings regarding this proposed rule change (including "TMB Telemedicine Committee" meetings and so-called "stakeholder" meetings), participating physicians made statements to the effect that they would just as soon see Teladoc gone from Texas, and that they were concerned that telemedicine takes business away from local physicians.

97.    Following a formal rule-making process, the TMB voted to adopt New Rule 174, which severely restricts telemedicine consultations, which are defined as consultations using real-time audio and video communication.  New Rule 174 also added a requirement of a "site presenter" to be present with the patient at a designated facility in many circumstances.

98.    A majority of the TMB members who voted to adopt New Rule 174 are physicians.

99.    New Rule 174 took effect on October 17, 2010.  As a result of New Rule 174, Teladoc ceased offering its members the option of video consultations in Texas because doing so was no longer feasible or cost effective to provide this option in light of the anticompetitive restrictions added in New Rule 174.  Teladoc continues to offer the option of video consultations in 44 other states.

100.    New Rule 174 had the anticompetitive effect of restricting competition and reducing consumer choice.  Specifically, by greatly limiting the use of video conferencing technology in telehealth consultations, the TMB's new rule mean that Teladoc's Texas members lost the option of selecting video.  This reduced the output of medical services and increased price.

COMPLAINT                                        23

101.    However, after New Rule 174 was adopted in October 2010, Teladoc continued to operate in Texas by offering a more limited set of services to Texas businesses and patients.

### b.  Anticompetitive "Interpretation" of Current Rule 190.8

102.    When the TMB recognized that it had not successfully eliminated competition from telehealth through its October 2010 revision of Rule 174, it looked for another avenue through which to prevent competition from Teladoc.

103.    On June 16, 2011, the TMB's General Counsel sent a letter to Teladoc asserting that Teladoc was in violation of existing Rule 190.8.  Existing Rule 190.8 provides that, before writing a prescription, a physician must establish a diagnosis through the use of acceptable medical practices "such as" patient history, mental status examination, an in-person physical examination, and diagnostic and laboratory testing.  The TMB took the position that although the rule referred to steps "such as" the ones listed, an in-person physical examination was in fact required in all cases.

104.    Significantly, the TMB's June 16, 2011 letter to Teladoc copied the Texas Medical Association ("TMA"), a trade association of doctors designed to promote the interests of doctors. On information and belief, the TMB copied the TMA on its letter to Teladoc because physicians belonging to the TMA had complained  about competition from Teladoc, and the TMB wanted the TMA to know that it was taking steps to try to prevent this competition.

105.    Teladoc filed suit in the 353rd Judicial District Court of Travis County, Texas, seeking a declaration that the TMB's interpretation was not an interpretation of current Rule 190.8 but, rather, was an amendment of the rule that the TMB was attempting to adopt without following the notice-and-comment requirements of the Texas Administrative Procedure Act.

106.    Teladoc also requested emergency relief to prevent the TMB from enforcing its new interpretation against telehealth providers.  And, on July 19, 2011, the Hon. John Dietz granted a

temporary restraining order, barring the TMB from enforcing the Rule as interpreted in the June 16, 2011 letter.  As Judge Dietz explained in granting Teladoc's request, Teladoc "will suffer immediate and irreparable harm because the proposed enforcement of the Rule will have an immediate and severe impact on Teladoc's ability to do business in Texas."  TRO at 1, *Teladoc, Inc. v. Tex. Med. Bd. Nancy Leshikar*, No. 03-13-00211-CV (Tex. Ct. App., 3d Dist. July 19, 2011).

107.    On August 10, 2011, the TMB agreed to extend the TRO during the pendency of the case.

108.    Even while the TMB's new interpretation of Rule 190.8 was stayed, the TMB sent letters to several of Teladoc's largest clients in Texas asserting that Teladoc was in violation of the Rule.  On information and belief, the TMB sent letters to these clients specifically because it was concerned about the business consequences of Teladoc's success in Texas: The TMB was concerned that Teladoc was winning business away from traditional physicians.

109.    On December 31, 2014, the Texas Third Court of Appeals rendered summary judgment for Teladoc, holding that Appeals agreed with Teladoc, holding that the "TMB's pronouncements in its June 2011 letter are tantamount to amendments to the existing text…TMB's pronouncements hardly 'track' Rule 190.8…rather, they depart from and effectively change that text."  Op. at 23, *Teladoc, Inc. v. Tex. Med. Bd. & Nancy Leshikar*, No. 03-13-00211-CV (Tex. Ct. App., 3d Dist. Dec. 31, 2014).

**c.  Anticompetitive Emergency Rulemaking**

110.    Undeterred, the TMB continued its campaign to try to prevent competition by Teladoc.  On January 16, 2015, the TMB called an emergency board meeting and adopted a purported "emergency" amendment to Rule 190.8.

111.    The TMB's emergency amendment mandated a "face-to-face visit or in-person

COMPLAINT                                    25

evaluation" before a physician can issue a prescription for drugs, regardless of the medical need for such an examination under the circumstances.  The TMB asserted that the "purpose of the emergency amendment is to protect the public health and welfare."

112.    On January 20, 2015, Teladoc filed suit in the District Court of Travis County, Texas, requesting a declaration that the TMB's emergency rule was invalid for lack of imminent peril as required by the APA and enjoining enforcement of the emergency rule.

113.    On February 6, 2015, the District Court agreed with Teladoc, holding that "[n]o imminent peril to public health, safety or welfare existed on January 16, 2015, or exists at the present time to justify adoption of the emergency rule and it is invalid."

### d.  Anticompetitive April 2015 Rulemaking

114.    Having lost twice in the courts, the TMB initiated the rule making procedure that is at the center of the present action.  Although Rule 190.8 was originally adopted in November 2003 without requiring a face-to-face visit in all cases, and although technological advances have only improved the quality of remote consultations since then, on March 6, 2015 the TMB formally proposed New Rule 190.8, which would require a face-to-face visit before a physician can issue a prescription to a patient, regardless of whether this is medically necessary under the circumstances.  ("New Rule 190.8").

115.    In total, the TMB received 206 written comments regarding proposed New Rule 190.8.  Of those 206 written comments, 203 of them (99%) opposed the new rule.  As the letters explained, the proposed rule would severely restrict access to telehealth consultations, and thereby raise prices and reduce access to healthcare for the people of Texas.

116.    Of the three letters in support of New Rule 190.8, two were filed by the Texas Medical Association.  The trade association noted that it generally supported New Rule 190.8, but it urged the TMB to amend the proposed new rule "[t]o ensure that physicians who are not

<u>involved in telemedicine</u>, but who are in a call arrangement with colleagues to provide for after-hours medical care" are permitted to continue participating in such "on-call" arrangements, thereby continuing the long-standing and well-accepted practice in Texas (and, indeed, around the country) of physicians treating their colleagues' patients through after-hours telephone consultations under appropriate circumstance, without a mandatory requirement for a face-to-face meeting in all cases.  Letter from the Texas Medical Association, D. Wilcox to R. Chapin (Feb. 6, 2015) (emphasis added).

117.    The TMB conducted a hearing on the proposed new rule on April 9, 2015.  At that hearing there was no empirical evidence of any sort introduced showing any actual harm to even a single patient as a result of telehealth.  TMB Board Member Frank Denton, a non-physician, commented on this fact, noting, "I have yet to -- out of thousands and thousands of [telehealth] encounters we haven't heard of any harm that was done as a result of this method of delivery of -- of a health care system."  April 10 Tr. 16:11-17; 31-24-32:3.

118.    The following day, April 10, 2015, the TMB promptly voted to adopt New Rule 190.8. The vote was 14-1 in favor.

119.    Of the 14 board members who voted in favor of the new rule, 12 are physicians.  The one dissenting vote came from Mr. Denton, a non-physician.

120.    Following the adoption of the new rule, Bill Hammond, Chief Executive Officer of the Texas Association of Business, stated that "[t]here's no question whatsoever" that New Rule 190.8 "is about doctors protecting other doctors' income.  It's about dollars.  It's not about better health care."

121.    Similarly, New Rule 190.8 has been described as "nonsensical" by the James A. Baker III Institute for Public Policy at Rice University, which warned against protectionism and noted that

"the potential of new technologies to change medicine is not something to be feared and constrained."

122.    The TMB has stated that it plans for the New Rule to go into effect on June 3, 2015.

123.    Even in advance of this planned effective date, on information and belief, one or more agents of the TMB have told pharmacists in Texas that they are at risk of violating Texas and federal law by filling prescriptions issued on the basis of a telephone consultation without a prior face-to-face meeting.  The TMB or those acting in concert with it distributed to major pharmacies copies of a document titled "Texas Pharmacists Police Physician-Patient Relationship" that describes this purported legal risk.  This document was given to Teladoc members when they had prescriptions filled.

## VI.   DEFENDANTS' CONDUCT HAS HARMED COMPETITION, COMPETITORS, AND CONSUMERS

124.    New Rule 190.8, if permitted to take effect, would have many serious anticompetitive effects.

125.    The New Rule would end Teladoc's provision of telehealth services in Texas.  This would have serious consequences for patients, businesses, and competitors like Teladoc.

### A.   New Rule 190.8 Would Harm Patients By Raising Prices And Reducing Supply of Physician Services

126.    As a result of New Rule 190.8, patients will pay higher prices for physicians' services, either in the form of out-of-pocket costs or elevated insurance premiums, to the extent they are forced to travel to a physician's office, urgent care center, or hospital, as a result of losing the option of treatment through a telehealth consultation.

127.    Patients will lose the choice of receiving treatment remotely through Teladoc or other telehealth providers, which for many patients is the most convenient form of healthcare.

128.    Some patients who would have sought treatment from Teladoc will, in its absence, delay or forgo receiving healthcare altogether, with potentially devastating consequences.

129.    Physicians will reduce their supply of patient services when they no longer have the option of flexibly supplying those services to patients through telehealth consultations;

130.    Consumers will lose the benefits of important technological improvements in healthcare (e.g., the iPhone otoscope, chronic condition monitoring assisted by smart watches).

### B.  New Rule 190.8 Would Harm Public And Private Payors By Raising Prices And Reducing Choice

131.    Healthcare payors, such as insurers, employers, and government entities (including state government entities) would pay higher prices to provide physician services to covered patients. The TMB claims that New Rule 190.8 will have no effect on small or micro businesses, but Teladoc services more than 300 small businesses in Texas, and these businesses will be substantially affected by their inability to secure important health benefits offered to their employees at reasonable cost, forcing them to incur substantial costs that many may not be able to afford.

132.    Moreover, the TMB claims that "for the first five-year period [New Rule 190.8] is in effect there will be no fiscal implication to state or local government as a result of enforcing the section as proposed."  This is plainly inaccurate, given that Teladoc serves hundreds of government entities in Texas, such as cities, counties, school systems, foster care centers and the Texas Teachers Retirement System, and provides them with healthcare services at lower cost than the alternatives.  New Rule 190.8 will have a indisputable direct and negative fiscal impact on state and local government by forcing all government entities that use Teladoc's services to switch to more expensive alternatives.

**C. New Rule 190.8 Is Not Reasonably Necessary Or Narrowly Tailored to Any Legitimate Objective**

133.    New Rule 190.8, like New Rule 174 before it, has no procompetitive virtues.  The original rule 190.8, adopted in November 2003, was acceptable to the TMB until Teladoc's business started to grow significantly.  Indeed, the TMB operated for years under Current Rule 190.8 without expressing concern over Teladoc's practices, despite being fully aware of how Teladoc provided telehealth services.

134.    New Rule 190.8 is not reasonably necessary because existing TMB rules fully protect patient safety, and the only effect of the revisions is to restrain competition by telehealth services.  Specifically, where the standard of care requires a physical examination, the TMB's existing rules already provide for disciplinary action against physicians who provide treatment without that examination.  *See* Tex. Admin. Code § 190.8(1)(A).

135.    New Rule 190.8 is also not reasonably necessary because Texas physicians have a long tradition of safely providing "on-call" services, treating patients of other physicians by telephone when appropriate, even when they have not conducted an in-person physical examination.  The TMB has never claimed that traditional on-call arrangements endanger patient safety.  Moreover, unlike a Teladoc consultation, in a traditional on-call arrangement the treating physician does not have training in telehealth, may never actually review the patient's medical files, cannot access HIPAA-compliant high-resolution photographs, does not have the benefit of technological safeguards like drug-interaction software, and does not create a contemporaneous electronic record of the consult.  Moreover, on-call physicians are not necessarily subject to a rigorous quality control review.

136.    New Rule 190.8 is also proved not to be reasonably necessary in light of the TMB's other rules that continue to permit phone-based treatment – including prescription-writing – by

physician assistants, even for patients the assistant has never met.  Texas Occupations Code §
157.002(c); Texas Administrative Code § 185.30.  Specifically, a physician assistant may use
"delegated authority" to listen to a patient's description of symptoms over the phone and issue a
prescription without consulting with the doctor and even though the assistant has never met the
patient.  The fact that New Rule 190.8 leaves the power to write prescriptions in the hands of
nurses and takes it away from board-certified physicians provides further evidence that any
purported safety justification for categorically requiring physicians to conduct in-person
examinations is pretextual.

137.    The rules are not reasonably necessary to accomplish any legitimate objective, nor are
they narrowly tailored to meet any such purpose.

138.    The only beneficiaries of New Rule 190.8 will be established office- and hospital-based
physicians who would face less competition as a result of the new rule

**D.  New Rule 190.8 Will Cause Irreparable Harm to Plaintiffs.**

139.    If New Rule 190.8 takes effect, Teladoc, Inc. will be put out of business in Texas.  This
will cause substantial losses in revenue from Texas clients and members, and it will also cause
substantial loss of business from non-Texas-based clients and members that also do business in
Texas, all of whom might stop working with Teladoc entirely if New Rule 190.8 takes effect.
Texas operations accounted for approximately $10 million, or 23%, of Teladoc's revenue in
2014, and out-of-state business from clients that also do business in Texas is substantially higher.

140.    Teladoc, Inc. will also suffer irreparable harm as a result of defections from its networks
of members and providers, such that even if service resumes in Texas after litigation, it will be
difficult to quantify the harm to Teladoc's on-going business operations.  At least one Teladoc
physician has already stopped providing consultations in Texas expressly because of uncertainty
regarding the TMB's "stand on telemedicine."

COMPLAINT                                   31

141.     Teladoc, Inc's good will with existing clients and future clients will be damaged.
Teladoc, Inc. operates nationally and some of its national clients – like Home Depot and Aetna –
have beneficiaries in Texas.  Teladoc, Inc.'s loss of Texas operations will damage good will with
those national clients and will impair Teladoc, Inc.'s ability to win new national clients.  In fact,
several of Teladoc's clients have already opted not to renew their agreements with Teladoc, and
others have put negotiations on hold or inquired about early termination, upon learning that the
TMB voted to adopt New Rule 190.8.  Thus, the New Rule 190.8 will not only shut down
Teladoc's operations in Texas, but it will threaten its ability to provide services in other states
that welcome telehealth providers.

142.     Teladoc's losses would also be irreparable because New Rule 190.8 would damage its
reputation for quality care, which is of central importance.  If the new rule is later invalidated,
Teladoc will not be able to simply pick up where it left off.

143.     Moreover, Teladoc's losses would be difficult to calculate because the telehealth industry
is at an inflection point.  Technological advances and growing consumer acceptance are driving
exponential growth in the adoption and utilization of telehealth services like Teladoc.  Although
Teladoc has been on the forefront of telehealth advocacy since its founding in 2002, payors have
only recently started to recognize telehealth as a safe, viable, and inexpensive healthcare option.
Now that Teladoc has positioned itself well to capitalize on the market's predicted explosive
growth over the next few years, the TMB's actions will force Teladoc to withdraw its services
from Texas, the third largest state and home to the headquarters of Teladoc itself.

144.     Disrupting Teladoc's business in Texas at this point in its trajectory will certainly cause
injury that will therefore be exceedingly difficult to quantify.  Teladoc's growth has been so
dramatic that its past revenues bear little relation to its likely future success.  Teladoc has

COMPLAINT                                                    32

experienced explosive revenue growth, earning $6.4 million in 2011, $10.1 million in 2012, $20 million in 2013, and $44 million in 2014. Teladoc's growth is likely to accelerate with its highly anticipated IPO. A forced withdrawal from providing services in Texas could jeopardize the IPO, and in any event bring Teladoc to the brink of bankruptcy, causing harm that will be difficult to quantify. But quantifying exactly how much business Teladoc could have won had it not been for New Rule 190.8 would be very difficult.

145.    Like most young companies, Teladoc is operating at a loss and needs financing to fund operations and continue its rapid expansion. Revised Rule 190.8, if it goes into effect, would raise Teladoc's cost of capital and prevent it from expanding during a critical growth stage. The rule would have significant impact on Teladoc's valuation in its IPO. For this reason, too, it would be difficult to estimate the harm to Teladoc of the new rule.

146.    Physicians, P.A. would lose its entire telehealth practice in Texas, and its only customer, Teladoc, Inc because it is not efficient or effective to offer telehealth consultations without the option of writing a prescription. Teladoc Physicians, P.A. will suffer defections of its Texas-licensed physician providers, and this valuable relationship, which allows Teladoc Physicians, P.A. to maintain a widespread network of doctors available to patients 24/7, may never be restored, even if telehealth operations resume in Texas.

147.    The new rule would also cause irreparable injury to Drs. Hood and Clark, who would lose their income from Texas consultations. Because of the rapid growth of telehealth, it is difficult to quantify the magnitude of this harm.

148.    Interference with market forces during an inflection point of technological advancement and growing consumer acceptance of telehealth will obstruct Teladoc's exponential growth.

149.    The TMB's adoption of a rule that is tantamount to a judgment that all Teladoc's

consultations are unsafe will significantly damage Teladoc's reputation as a safe, high-quality provider of medical services.

## VII.   CLAIMS FOR RELIEF

### COUNT I

**Violation of the Sherman Act, 15 U.S.C. § 1 – Unreasonable Restraint of Trade**

150.   Plaintiffs incorporate by reference paragraphs 1-149.

151.   Defendants agreed to take the many anticompetitive actions detailed above, including the adoption of New Rule 190.8.

152.   These actions have in the past and would in the future unreasonably restrain trade by dramatically restricting telehealth services in Texas.

153.   These actions have the anticompetitive effects detailed above, including raising prices and reducing the output of physician services.

154.   These actions have caused harm and threaten to cause irreparable harm to Plaintiffs..

### COUNT II

### 42 U.S.C. § 1983 - DORMANT COMMERCE CLAUSE VIOLATION

155.   Plaintiffs incorporate by reference paragraphs 1 – 149.

156.   The Commerce Clause of the Constitution gives Congress, not the states, the power to regulate interstate commerce.  U.S. Const. art. I, § 8, Cl. 3.

157.   The actions detailed above, including New Rule 190.8's requirement of an in-person physical examination, will have the effect of prohibiting Teladoc's Texas-licensed physicians from practicing medicine while located outside of Texas.

158.    Defendants' actions thus prohibit out-of-state physicians from competing with physicians who reside in Texas.

159.    By discriminating against out-of-state physicians, the New Rule violates the Commerce Clause.

## VIII.   APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF

160.    Plaintiffs are contemporaneously filing an application for a preliminary injunction to prevent New Rule 190.8 from taking effect prior to its proposed effective date of June 3, 2015. Plaintiffs incorporate that application by reference in this Complaint.

161.    Plaintiffs reserve the right to seek supplemental relief for any damages they may sustain following an affirmative ruling on this request for injunctive relief.

## IX.   DEMAND FOR JURY TRIAL

162.    Plaintiffs demand a trial by jury of all issues so triable in this case.

## X.   PRAYER FOR RELIEF

THEREFORE, Plaintiffs pray for relief as follows:

163.    Injunctive relief under Federal Rule of Civil Procedure 65 to preliminarily and permanently enjoin Defendants' enforcement of New Rule 190.8.

164.    Injunctive relief under Federal Rule of Civil Procedure 65 to permanently enjoin Defendants' enforcement of New Rule 174.

165.    Declare that Defendants' amendments of these two rules are invalid and unenforceable.

166.    Such other relief as the nature of this case may require or as the Court deems just and proper.

Date: April 29, 2015

Respectfully submitted,

JACKSON WALKER L.L.P.
100 Congress Avenue, Suite 1100
Austin, Texas 78701
(512) 236-2000 (Telephone)
(512) 236-2002 (Facsimile)

By:    */s/ James M. Dow*
       James Matthew Dow
       mdow@jw.com
       State Bar No. 06066500
       Dudley McCalla
       dmccalla@jw.com
       State Bar No. 13354000

CLEARY GOTTLIEB STEEN & HAMILTON LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 974-1500 (Telephone)
(202) 974-1999 (Facsimile)
George S. Cary
gcary@cgsh.com
D.C. Bar No. 285411
Leah Brannon
lbrannon@cgsh.com
D.C. Bar No. 467359
Drew Navikas
dnavikas@cgsh.com
D.C. Bar No. 1015606
*Motions Pro Hac Vice Pending*

ATTORNEYS FOR PLAINTIFFS
TELADOC, INC., TELADOC PHYSICIANS, P.A.,
KYON HOOD, AND EMMETTE A. CLARK

## **CERTIFICATE OF SERVICE**

This is to certify that on this 29th day of April, 2015, a true and correct copy of the foregoing instrument was electronically filed by the Court's ECF system, and a true and correct copy was delivered by email and fax to Ted Ross with the Office of the Texas Attorney General Administrative Division.

*/s/ James M. Dow*
James M. Dow