IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| TELADOC, INC., *et al*., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 1:15-CV-00343-RP |
| | § | |
| TEXAS MEDICAL BOARD, *et al*., | § | |
| Defendants. | § | |

## DEFENDANTS' AMENDED MOTION TO DISMISS

In support of their motion, under FED. R. CIV. P. 12(b)(1) and -(6), to dismiss Plaintiffs'

Amended Complaint (ECF doc. 55), the defendants[1] respectfully submit the following.

---

[1] The TMB as an entity and the defendant board members in their individual capacity have been dismissed with prejudice.  Doc. 63.

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION AND BACKGROUND ............................................................... 2

STANDARDS FOR DISMISSAL ........................................................................... 4

ARGUMENT ........................................................................................................... 5

I.      The Court Lacks Jurisdiction Over Plaintiffs' Antitrust Claim. ............................ 5

        A.      State Action Immunity is Jurisdictional. ................................................... 5

        B.      State Action Immunity Requires Active State Supervision to Realistically
                Assure the Promotion of Clearly Articulated State Policy ......................... 6

        C.      In Contrast to the Texas Medical Board, the North Carolina Dental
                Board was not Actively Supervised by the State. ...................................... 9

        D.      In Contrast to the North Carolina Dental Board, Active State
                Supervision Provides Realistic Assurance that the TMB Promotes
                State Policy and Removes the Risk of the Defendants Promoting
                Their Personal Interests ........................................................................... 11

                1.      The state actively supervises the TMB through SOAH
                        and judicial review. ...................................................................... 11

                        a.      The instant case requires this Court to answer the
                                judicial review question left open by the Supreme Court. ............ 11

                        b.      SOAH and judicial review of TMB rules and actions provide
                                the safeguards missing from Oregon's putative judicial review
                                of hospital peer review decisions. ................................................ 12

                                (1)     Judicial review of TMB rules provides active
                                        state supervision .............................................................. 12

                                (2)     SOAH and judicial review of TMB disciplinary
                                        actions provide active state supervision ........................... 14

                2.      The state actively supervises the TMB through Legislative
                        oversight ...................................................................................... 16

a.   The Legislature oversees the TMB through sunset review and adoption by reenactment. .............................................16

b.   The Legislature oversees the TMB through review of proposed rules ..............................................................................20

3.  Other relevant features of the TMB realistically assure the promotion of state policy over private interests...................................23

4.  The parallels between the contested rules and state statutes realistically assure the promotion of state policy over private interests ....................................................................................27

II.     The Plaintiffs Cannot State a Viable Claim For Relief On Their Interstate Commerce Clause Claim. ....................................................................................30

III.    The Plaintiffs' Claims Attacking "New Rule 174" Are Time-Barred. ..................34

A.    The Plaintiffs' Antitrust Claim Attacking "New Rule 174" is Time-Barred. ..........................................................................................35

B.    The Plaintiffs' Section 1983 Claim Attacking "New Rule 174" is Time-Barred. ..........................................................................................38

CONCLUSION...................................................................................................................39

CERTIFICATE OF SERVICE ..........................................................................................40

# TABLE OF AUTHORITIES

**Cases**

*10 Ring Precision, Inc. v. Jones*,
  722 F. 3d 711 (5th Cir. 2013) ................................................. 20

*Abbott v. Tex. Bd of Nursing*,
  2010 WL 392335 (Tex. App.—Austin 2010, no pet.) ........................... 25

*Abbott v. Tex. State Bd of Pharmacy*,
  391 S.W. 3d 253 (Tex. App.—Austin 2012, no pet.) .......................... 25

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................. 4, 12, 33, 34

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................... 4, 33, 34

*Brinac v. E.E.O.C.*,
  996 F.2d 304 (5th Cir. 1993) ................................................. 6

*Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*,
  445 U.S. 97 (1980) ........................................................... 7

*Conopco, Inc. v. Campbell Soup Co.*,
  95 F.3d 187 (2nd. Cir. 1996) ............................................ 35, 36

*Corzo v. Banco Cent. de Reserva del Peru*,
  243 F.3d 519 (9th Cir. 2001) ................................................. 6

*Daigle v. Opelousas Health Care, Inc.*,
  774 F.2d 1344 (5th Cir. 1985) ............................................... 30

*Danner Const. Co. v. Hillsborough Cnty., Fla.*,
  608 F.3d 809 (11th Cir. 2010) ............................................... 6

*Edmonds v. Oktibbeha County*,
  675 F.3d 911 (5th Cir. 2012) ............................................... 38

*F.T.C. v. Ticor Title Ins. Co.*,
  504 U.S. 621 (1992) ..................................................... 21, 22

*Familias Unidas v. Briscoe*,
  619 F.2d 391 (5th Cir. 1980) ............................................... 31

*Ferrer v. Chevron Corp.*,
484 F.3d 776 (5th Cir. 2007) ........................................................................... 4

*Ferris v. Tex. Bd of Chiropractic Exam'rs*,
808 S.W. 2d 514 (Tex. App.—Austin 1991) ................................................... 25

*Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*,
527 U.S. 627 (1999)......................................................................................... 31

*Frame  v. City of Arlington.*,
657 F.3d 215 (5th Cir. 2011) ........................................................................... 38

*Freeman v. U.S.*,
556 F.3d 326 (5th Cir. 2009) ............................................................................. 4

*Funk v. Stryker Corp.*,
631 F.3d 777 (5th Cir. 2011) ............................................................................. 5

*Gibson v. Tex. Dept. of Ins. – Div. of Workers' Comp.*,
700 F.3d 227 (5th Cir. 2012) ............................................................... 4, 33, 34

*Granek v. Tex. State Bd of Med. Exam'rs*,
172 S.W. 3d 761 (Tex. App.—Austin 2005, no pet..) .................................... 25

*Hafer v. Melo*,
502 U.S. 21 (1991)............................................................................................. 2

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
392 U.S. 481 (1968)......................................................................................... 36

*Harlingen Family Dentistry, P.C. v. Tex. Health & Human Servs. Comm'n*,
452 S.W.3d 479 (Tex. App.—Austin 2014, pet. filed)................................... 13

*Harris v. Hegmann*,
198 F.3d 153 (5th Cir. 1999) ........................................................................... 38

*Homoly v. N. Ca. State Bd. of Dental Exam'rs*,
468 S.E.2d 481 (N.C. App.),
*pet. denied,* 471 S.E.2d 71 (N.C. 1996) ....................................................... 10

*Horbach v. Kaczmarek*,
288 F.3d 969 (7th Cir. 2002) ........................................................................... 35

*Humble Oil & Refining Co. v. Calvert,*
414 S.W.2d 172 (Tex. 1967)............................................................................ 17

*In re Great Lakes Dredge & Dock Co. LLC*,
    624 F.3d 201 (5th Cir. 2010) ........................................................................... 12

*In re Travel Agent Comm'n Antitrust Litig.*,
    583 F.3d 896 (6th Cir. 2009) .................................................................... 36, 37

*Interfirst Bank Dallas, N.A. v. U.S.*,
    769 F.2d 299 (5th Cir. 1985) .......................................................................... 6

*Kaiser Aluminum & Chem. Sales, Inc. v. avondale Shipyards, Inc.*,
    677 F.2d 1045 (5th Cir. 1982) ........................................................... 34, 36, 37

*Kassel v. Consol. Freightways Corp. of Del.*,
    450 U.S. 662 (1981) ...................................................................................... 34

*Martin v. Mem'l Hosp. at Gulfport*,
    86 F.3d 1391 (5th Cir. 1996) ...................................................................... 5, 6

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*,
    392 F.3d 265 (8th Cir. 2004) .................................................................... 36, 37

*Miller v. Ind. Hosp.*,
    930 F.2d 334 (3rd Cir. 1991) ....................................................................... 12

*N. C. State Bd. of Dental Exam'rs v. FTC*,
    574 U.S. ___, 135 S. Ct. 1101 (2015) ........................... 2,5,6,7,8,9,12,14,16,19,24,26,27,28,29

*Nat'l Healthcare Invs., Inc. v. State of La.*,
    2002 WL 663780 (5th Cir. 2002) ................................................................. 20

*Oliver v. SD-3C LLC*,
    751 F.3d 1081 (9th Cir. 2014),
    *cert. denied*, 135 S.Ct. 1733 (2015) ..................................................... 35, 36, 37

*Parker v. Brown*,
    317 U.S. 341 (1943) ......................................................................... 2, 5, 13, 16, 23

*Patrick v. Burget*,
    486 U.S. 94 (1988) .............................................................................. 11, 12, 21

*Pharm. Research & Mfrs. of Am. v. Cnty. of Alameda*,
    768 F.3d 1037 (9th Cir. 2014) ........................................................... 31, 32, 33, 34

*PhoneDOCTORx, LLC v. Healthbridge Mgmt., Inc.*,
    58 F. Supp. 3d 152 (D. Mass. 2014) ............................................................ 30

*Pike v. Bruce Church, Inc.,*
   397 U.S. 137 (1970) ........................................................................... 31, 32

*Pinhas v. Summit Health, Ltd.*,
   894 F.2d 1024 (9th Cir. 1989),
   *aff'd*, 500 U.S. 322 (1991) ...................................................................... 12

*Price v. City of San Antonio,*
   431 F.3d 890 (5th Cir. 2005) ................................................................... 38

*Raj v. La. State Univ.*,
   714 F.3d 322 (5th Cir. 2013) ..................................................................... 4

*Ramirez v. Ahn*,
   843 F.2d 864 (5th Cir. 1988) ..................................................................... 3

*Ramming v. U. S.*,
   281 F.3d 158 (5th Cir. 2001) ..................................................................... 4

*Reed v. State Dep't of Licensing & Regulation*,
   820 S.W.2d 1 (Tex. App.—Austin 1991, no writ) ................................... 17

*Roemmich v. Eagle Eye Dev., LLC*,
   526 F.3d 343 (8th Cir. 2008) ................................................................... 36

*Rogers v. State Bd. of Optometry*,
   619 S.W.2d 603 (Tex. Civ. App.—Eastland 1981, no writ) ................... 25

*State v. Kane*,
   586 S.W.2d 812 (Mo. Ct. App. E.D. 1979) ........................................... 29

*Sw. Life Ins. Co. v. Montemayor*,
   24 S.W.3d 581 (Tex. App. – Austin 2000, pet. denied) ......................... 17

*Tandy Corp. v. Malone & Hyde, Inc.*,
   769 F.2d 362 (6th Cir. 1985) ................................................................... 35

*Teladoc, Inc. v. Tex. Med. Bd.*,
   453 S.W.3d 606 (Tex. App. – Austin 2014, pet. filed) ...................... 16-17

*Tex. Orthopaedic Ass'n v. Tex. State Bd. of Podiatric Med. Exam'rs*,
   254 S.W.3d 714 (Tex. App.—Austin 2008, pet. denied) ................... 13, 14

*Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*,
   375 S.W.3d 464 (Tex. App.—Austin 2012, pet. denied) ....................... 14

*Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*,
    458 S.W.3d 552 (Tex. App.—Austin 2015, no pet. his.) ....................................... 14

*Tex. State Bd. of Pub. Accountancy v. Bass*,
    366 S.W.3d 751 (Tex. App.—Austin 2012, no pet.) ........................................... 25

*Tex. State Bd. of Veterinary Med. Exam'rs v. Giggleman*,
    408 S.W.3d 696 (Tex. App.—Austin 2013, no pet.) ........................................... 25

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
    61 F.3d 245 (2nd Cir. 2001),
    *aff'd*, 550 U.S. 330 (2007) ........................................................................ 31, 32, 33

*Wilson v. Birnberg*,
    667 F.3d 591 (5th Cir. 2012) .............................................................................. 4

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    401 U.S. 321 (1971) ......................................................................................... 36

*Z Techs. Corp. v. Lubrizol Corp.*,
    753 F.3d 594 (6th Cir. 2014) ............................................................................ 36


**Statutes**

1 T.A.C. §§ 354.1430 - 354.1432 .......................................................................... 28

1 T.A.C. § 354.1432(2)(E)-(F) .............................................................................. 28

21 U.S.C. § 802(54) ............................................................................................ 30

21 U.S.C. § 829(e)(2)(A) ...................................................................................... 30

22 T.A.C. part 9 .................................................................................................. 19

22 T.A.C. Chapter 174 ......................................................................................... 34

22 T.A.C. § 174.2(10) .......................................................................................... 27

22 T.A.C. § 174.7 ................................................................................................ 28

22 T.A.C. § 174.7(a) ............................................................................................ 27

22 T.A.C. §§ 174.8 .............................................................................................. 27

22 T.A.C. § 187.83(f) ........................................................................................... 14

22 T.A.C. § 190.8 .................................................................................................... 34

22 T.A.C. § 190.8(1)(L) ................................................................................... 6, 16, 33

22 T.A.C. § 190.8(1)(L)(i)(II) ............................................................................... 28

42 C.F.R. § 410.78(a)(1),-(3),-(b) ...................................................................... 30

CAL. BUS. & PROF. CODE § 2242(a) ................................................................. 29

CAL. BUS. & PROF. CODE § 2242.1(a) .............................................................. 29

ILL. ADMIN. CODE tit. 89, § 140.403(b) ............................................................ 29

N.C. GEN. STAT. § 90-22 ...................................................................................... 10

N.C. GEN. STAT. ANN. § 90-22 Credits (West) ................................................ 10

N.C. GEN. STAT. § 150B-40 ................................................................................. 10

N.C. GEN. STAT. § 160A-239.1 ........................................................................... 10

N.Y. PUB. HEALTH LAW § 2999-cc .................................................................... 29

TEX. CONST. art. XVI § 1 ..................................................................................... 25

TEX. GOV'T CODE § 325.003(a) ......................................................................... 17

TEX. GOV'T CODE § 325.003(b) ......................................................................... 18

TEX. GOV'T CODE § 325.008(a)(3) .................................................................... 18

TEX. GOV'T CODE § 325.0115(b) ....................................................................... 18

TEX. GOV'T CODE § 531.001(7) .......................................................................... 27

TEX. GOV'T CODE § 531.001(8) .......................................................................... 27

TEX. GOV'T CODE § 531.0216 ............................................................................. 28

TEX. GOV'T CODE § 531.02163 ........................................................................... 28

TEX. GOV'T CODE § 531.0217(c-1)(1) ............................................................... 27

TEX. GOV'T CODE § 531.0217(i-1) ..................................................................... 28

TEX. GOV'T CODE § 531.0217(i)(3) ............................................................. 27

TEX. GOV'T CODE  ch. 551 ........................................................................... 25

TEX. GOV'T CODE § 551.001(3)(A) .............................................................. 25

TEX. GOV'T CODE  ch. 552 ........................................................................... 25

TEX. GOV'T CODE § 552.003(1)(A)(i) ........................................................... 25

TEX. GOV'T CODE  ch. 572 ........................................................................... 25

TEX. GOV'T CODE § 2001.003(7) .................................................................. 25

TEX. GOV'T CODE § 2001.023 ...................................................................... 22

TEX. GOV'T CODE § 2001.033(a) .................................................................. 13

TEX. GOV'T CODE § 2001.032(a)-(b) ................................................... 20, 21, 22

TEX. GOV'T CODE § 2001.035 ...................................................................... 13

TEX. GOV'T CODE § 2001.038 ............................................................ 12, 13, 15

TEX. GOV'T CODE § 2001.038(a) .................................................................. 13

TEX. GOV'T CODE § 2001.058(b) & -(d) ........................................................ 15

TEX. GOV'T CODE § 2001.058(e) .................................................................. 15

TEX. GOV'T CODE § 2001.174(2)(B) .............................................................. 15

TEX. GOV'T CODE § 2001.171 ...................................................................... 15

TEX. GOV'T CODE  chs. 2001 - 2002 .............................................................. 25

TEX. GOV'T CODE  ch. 2005 ......................................................................... 25

TEX. GOV'T CODE  ch. 2051 ......................................................................... 25

TEX. GOV'T CODE  ch. 2052 ......................................................................... 25

TEX. GOV'T CODE  ch. 2101 ......................................................................... 25

TEX. GOV'T CODE  ch. 2155 ......................................................................... 25

TEX. GOV'T CODE § 2262.053 .......................................................................... 25

TEX. OCC. CODE § 111.004 ............................................................................. 24

TEX. OCC. CODE § 151.004 ............................................................................. 17

TEX. OCC. CODE § 151.056 ............................................................................. 23

TEX. OCC. CODE § 152.002(a) ........................................................................ 23

TEX. OCC. CODE § 152.004(c) ........................................................................ 26

TEX. OCC. CODE § 152.010(a)(7) ................................................................... 15

TEX. OCC. CODE § 152.010(a)(7)-(8) ............................................................. 26

TEX. OCC. CODE § 152.055 ............................................................................. 26

TEX. OCC. CODE § 153.004(a)(1) ................................................................... 24

TEX. OCC. CODE § 164.007(a-1) .................................................................... 15

TEX. OCC. CODE § 164.009 ............................................................................. 14

TEX. OCC. CODE § 164.051(a)(6) ................................................... 16, 17, 18, 20

TEX. OCC. CODE § 164.003 ............................................................................. 15

TEX. OCC. CODE § 165.002 ............................................................................. 15

TEX. OCC. CODE § 165.052 ............................................................................. 14

TEX. OCC. CODE § 164.007(a) ........................................................................ 15

U.S. CONST. amend. XIV § 5 .......................................................................... 31

**Other Authorities**

American Health Lawyers Association, "Telehealth: A Fifty State Survey,"
    https://www.healthlawyers.org ............................................................... 30

"Final Results from Last Sunset Report," https://www.sunset.texas.gov/reviews-
    and-reports/agencies/texas-state-board medical-examiners .................... 18

15A ADMINISTRATIVE LAW AND PROCEDURE k436 .................................... 10

http://www.cdc.gov/phlp/docs/pdpe-requirements.pdf.................................................. 29

S.B. 419 (http://www.legis.state.tx.us/tlodocs/79R/billtext/html/SB00419F.HTM).................... 17

Steven Ogle, *A Look at Sunset and How Stakeholders Can Effectively Participate
    in the Process*, 13 TEX. TECH ADMIN. L.J. 291, 294 (2012) .................................................... 17

**Rules**

FED. R. CIV. P. 12(b)(1) ............................................................................................. 1, 2

FED. R. CIV. P. 12(b)(6) ............................................................................................... 1

## INTRODUCTION AND BACKGROUND

From the briefing and argument on the application for preliminary injunction (docs. 10 *et seq*., 21 *et seq*., and 35), as well as the many amicus briefs, the Court is no doubt familiar with the plaintiffs' allegations.  For purposes of their arguments under FED. R. CIV. P. 12(b)(1), the defendants will also refer to facts, supported by evidence, that have not been and cannot be controverted by the plaintiffs.  For the reasons explained in doc. 21 at 2-13, the defendants do not concede that the contested rules have a net anticompetitive effect.  However, as shown in part **I** of the Argument, because antitrust law is inapplicable to the TMB,[2] it is immaterial whether the rules at issue can be characterized as, in some respects, "anticompetitive."

The principal contention of plaintiffs Teladoc *et al*. in this case is that the Supreme Court's ruling in *N. C. State Bd. of Dental Exam'rs v. FTC*, 574 U.S. ___, 135 S. Ct. 1101 (2015) ("*NCSBDE*"), eviscerates immunity from antitrust claims for all state regulatory boards composed of "market participants."  But, as shown in part **I** below, their reading of *NCSBDE* is incorrect.  The state action immunity doctrine should apply to the actions of the TMB for two chief reasons.

First, the plaintiffs' portrayal of *NCSBDE* serves to undermine federalism and state sovereignty principles and to disrupt the ability of the State of Texas to protect its citizens.  Since *Parker v. Brown*, 317 U.S. 341 (1943), certain forms of state action have been protected from antitrust liability because courts have recognized that states have the right and duty to pass laws with anti-competitive results for the public's welfare.  Texas has invested the Texas Medical Board with mandates to ensure minimum standards for the practice of medicine and to regulate the professional conduct of physicians.  The plaintiffs' efforts to interfere with the TMB's decisions

---

[2]  Because the defendants in their official capacity assume the identity of the Texas Medical Board, *Hafer v. Melo*, 502 U.S. 21, 27 (1991), this motion will refer to the defendants and the TMB interchangeably.

are precisely the kind held to be outside the purview of the federal antitrust laws in a system of dual sovereignty.

> We cannot overemphasize the limited role of federal courts in reviewing decisions . . . which are made by an agency of the state exercising its police powers as mandated by the Constitution.  It is the duty of the Texas Board of Medical Examiners to protect the public from individuals who may endanger public health and safety through their practice of medicine.  A federal court has no business intruding upon the substantive decisions of a public institution by substituting its judgment for that of the public body.

*Ramirez v. Ahn*, 843 F.2d 864, 869 (5th Cir. 1988).

Second, in *NCSBDE* the Supreme Court developed a "flexible and context-dependent" standard that looks to the structure and incentives of a regulatory agency to determine whether active supervision is required.  Here, there can be no legitimate doubt that the Texas Medical Board is acting within its capacity as a sovereign to police the medical profession for the benefit of the citizens of Texas.  Its members are appointed by the Governor, it acts pursuant to state statutory authority, and regulations promulgated by the TMB (including the challenged rules) are subject to judicial review and legislative oversight.  These features constitute active state supervision and provide realistic assurance that the Texas Medical Board promotes state policy.  A decision to treat the TMB as a non-sovereign entity that requires more bureaucratic oversight will have far-reaching effects on Texas's regulation of professions, and thus cautions against a finding that board members can be sued for antitrust violations.

Accordingly, for the reasons discussed below, this Court should dismiss the plaintiffs' antitrust claim against TMB based on state action immunity, and in part as time-barred.  The plaintiffs' claim under the Dormant Commerce Clause should be dismissed for lack of jurisdiction, failure to state a claim upon which relief may be granted, and in part as time-barred.

## STANDARDS FOR DISMISSAL

"[T]he court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. U. S.*, 281 F.3d 158, 161 (5th Cir. 2001) (internal quotation marks omitted). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction," so that "the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Raj v. La. State Univ.*, 714 F.3d 322, 327 (5th Cir. 2013). Under this rule, this Court "has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Freeman v. U.S.*, 556 F.3d 326, 334 (5th Cir. 2009).

"A complaint will not survive a motion to dismiss" under Rule 12(b)(6) "unless it pleads sufficient facts to allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct." *Gibson v. Tex. Dept. of Ins. – Div. of Workers' Comp.*, 700 F.3d 227, 233 (5th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007))). "We make all inferences in a manner favorable to the plaintiff, 'but plaintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim.'" *Wilson v. Birnberg*, 667 F.3d 591, 595 (5th Cir. 2012).

"We construe the plaintiffs' complaints in the light most favorable to them, accepting all well-pleaded facts as true, but we do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007) (brackets and internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Gibson*, 700 F.3d at 233 (quoting *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555)).

"When reviewing a motion to dismiss, a district court 'must consider . . . sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, . . . matters of which a court may take judicial notice.'" *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (holding that "the district court took appropriate judicial notice of publicly-available documents and transcripts produced by the [defendant], which were matters of public record directly relevant to the issue at hand").

## ARGUMENT

**I.    The Court Lacks Jurisdiction Over The Plaintiffs' Antitrust Claim.[3]**

    **A.  State Action Immunity is Jurisdictional.**

The TMB rules challenged by the plaintiffs are "immune from antitrust scrutiny" to the extent that "the State effectively has made this conduct its own." *NCSBDE*, 135 S. Ct. at 1116. The Sherman Act was not intended "to restrain a state or its officers or agents from activities directed by its legislature." *Martin v. Mem'l Hosp. at Gulfport*, 86 F.3d 1391, 1395 (5th Cir. 1996) (quoting *Parker*, 317 U.S. at 350-51).  Federal antitrust laws were not "intended to restrain . . . official action directed by a state." *Parker*, 317 U.S. at 351.  "If every duly enacted state law or policy were required to conform to the mandates of the Sherman Act, thus promoting competition at the expense of other values a State may deem fundamental, federal antitrust law would impose an impermissible burden on the States' power to regulate." *NCSBDE*, 135 S. Ct. at 1109.

---

[3]  In their brief in opposition to preliminary injunction, the defendants declared that they did "not waive, and expressly reserve the right to assert, any defenses, affirmative or otherwise, that would defeat the plaintiffs' claims apart from the merits thereof," including but not limited to "state action immunity." Doc. 21 at 2.  At the May 22nd hearing, the Court stated that the defendants' reservation of the defense was without prejudice to their raising it subsequently.  Consequently, the Court's discussion in its injunction decision, doc. 44 at 5-6, does not foreclose a jurisdictional defense, which of course may be raised at any time.

State action immunity to an antitrust claim (also known as "*Parker* immunity") is an immunity to suit, not merely a defense to liability. *Danner Const. Co. v. Hillsborough Cnty., Fla.*, 608 F.3d 809, 812 n. 1 (11th Cir. 2010); *Martin*, 86 F.3d at 1395-97. Governmental immunity to suit, unless the plaintiffs can show that it does not apply, deprives the Court of jurisdiction. *See, e.g.*, *Corzo v. Banco Cent. de Reserva del Peru*, 243 F.3d 519, 522 (9th Cir. 2001); *Brinac v. E.E.O.C.*, 996 F.2d 304 (5th Cir. 1993) (Table, text in 1993 WL 241492, *2); *Interfirst Bank Dallas, N.A. v. U.S.*, 769 F.2d 299, 303 (5th Cir. 1985).

Contrary to the plaintiffs' rendition of the holding, *NCSBDE* does not categorically preclude state action immunity for any professional licensing and regulatory board on which a majority of members belong to the profession regulated. Instead, "the inquiry regarding active supervision is flexible and context-dependent." *NCSBDE*, 135 S. Ct. at 1116. The application of this standard is significant because the TMB is materially different from the regulatory board at issue in *NCSBDE*. Thus, when the Texas Medical Board enacted the 2010 amendments to 22 T.A.C. ch. 174 and the 2015 amendments to section 190.8(1)(L), the board was promoting state policy without regard for the members' own personal interests. *NCSBDE*, 135 S. Ct. at 1116.

### B. State Action Immunity Requires Active State Supervision to Realistically Assure the Promotion of Clearly Articulated State Policy.

The analysis must begin with what the Supreme Court actually said in *NCSBDE*. Because that decision was the result of a careful balancing of competing interests, it is not the simplistic edict posited by the plaintiffs. Its holdings cannot be applied in this case without a more careful examination of all the relevant circumstances than was possible prior to the preliminary injunction.

In a previous case, "arising from California's delegation of price-fixing authority to wine merchants," the Supreme Court had held that such an arrangement is immunized from antitrust

scrutiny only if "first, the State has articulated a clear policy to allow the anticompetitive conduct, and second, the State provides active supervision of the anticompetitive conduct." *Id*. at 1111 (citing *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980)). It is important to note that the North Carolina dental board did not argue that it met the *Midcal* standard. *NCSBDE*, 135 S. Ct. at 1116 ("The Board does not contend in this Court that its anticompetitive conduct was actively supervised by the State or that it should receive *Parker* immunity on that basis."). Instead, its sole basis for state action immunity was its contention that "entities designated by the States as agencies are exempt from *Midcal*'s second requirement." *Id*. at 1113.

The Court, however, insisted that "the need for supervision turns not on the formal designation given by States to regulators but on the *risk* that active market participants will pursue *private* interests in restraining trade." *Id*. at 1114 (emphasis added). Consequently, the central holding of the case is not that a state medical board with a physician majority is *ipso facto* divested of state immunity, but rather "that a state board on which a controlling number of decisionmakers are active market participants in the occupation the board regulates must satisfy *Midcal*'s active supervision requirement in order to invoke state-action antitrust immunity." *Id*.

This context is highly significant for the analysis in the present action. Because the North Carolina board did "not claim that the State exercised active, or indeed any, supervision over its conduct," the Supreme Court could not and did not specify what kind of supervision "the State" must exercise in order to immunize a professional regulatory board from antitrust attack. *Id*. at 1116 ("as a result, no specific supervisory systems can be reviewed here"). Instead of the irrebuttable presumption urged by the plaintiffs, this Court must conduct an "inquiry [that] is flexible and context-dependent," and which "will depend on all the circumstances of a case." *Id*.

Of special significance for the discussion in **I-D-4** below, the Court held that, "State legislation . . . will satisfy this standard, and *ipso facto* [is] exempt from the operation of the antitrust laws because [it is] an undoubted exercise of state sovereign authority." *Id*. at 1110 (internal quotation marks omitted).

From its in-depth review, this Court must determine (not merely presume the negative) "whether the State's review mechanisms provide '*realistic* assurance' that [the defendants'] anticompetitive conduct 'promotes state policy, rather than merely the party's individual interests.'" *Id*. (emphasis added); *accord id*. at 1112 (same).  The only requirements identified by the Supreme Court are that the state supervising authority "must review the substance of the anticompetitive decision, . . . ; . . . must have the power to veto or modify particular decisions to ensure they accord with state policy; and . . . may not itself be an active market participant." *Id*. at 1116 (citation omitted).

When these criteria are satisfied, the board's actions are immunized, even if the policy they promote is deemed "anticompetitive."  *Id*. at 1109 ("The States, however, when acting in their respective realm, need not adhere in all contexts to a model of unfettered competition," but may "impose restrictions on occupations [and] otherwise limit competition to achieve public objectives.").  The Court expressly recognized the value of having physicians oversee, on behalf of the public, the practice of medicine.  *Id*. at 1115 ("The States . . . may conclude there are substantial benefits to staffing their agencies with experts in complex and technical subjects," so as to "draw upon the expertise . . . of professionals")

A flexible, context-specific comparison of all of the relevant circumstances pertaining to the North Carolina dental board and the Texas Medical Board shows that the Texas medical

regulatory system is structured to provide realistic assurance that TMB members are promoting

state policy and to obviate the risk of their serving purely parochial interests.

### C.  In Contrast to the Texas Medical Board, the North Carolina Dental Board was not Actively Supervised by the State.

The plaintiffs rely on two superficial parallels between the North Carolina dental board and

the TMB: (1) both were established by state law to license and regulate health care professionals

and (2) a majority of the members of each board belong to the profession the board regulates.

However, contrary to the plaintiffs' assertions, this is only the beginning of the inquiry, not the

end.  Key features of the North Carolina system stand in stark contrast, in material respects, to

their Texas counterparts.

The Supreme Court called attention to four very important distinguishing features.  First,

the dentist members (who hold six of eight seats on the board) are elected by the licensed dentists

of North Carolina, while only one of the eight members is appointed by the governor.  *NCSBDE*,

135 S. Ct. at 1108.  Second, some of the dentist board members were in direct competition with

the practitioners against whom the disputed action was taken.  *Id*. at 1116.  Third, the board had

no state statutory authority to take the action in question.  *Id*. at 1110, 1116.  Fourth, the action at

issue was not the promulgation of a rule,[4] interpretation of a rule, or enforcement of a rule.  *Id*. at

1108, 1116.

---

[4]  The Court noted that the board's actions "did not result in a formal rule or regulation reviewable by the independent Rules Review Commission."  *Id*. at 1108.  "The Board may promulgate rules and regulations governing the practice of dentistry within the State, provided those mandates are not inconsistent with the Act and are approved by the North Carolina Rules Review Commission, whose members are appointed by the state legislature."  *Id*.  Had the board enforced a rule, issued within its statutory authority and approved by the Rules Review Commission, it would likely have enjoyed state action immunity.

The third and fourth distinctions above are of especial relevance to the discussion in **I-D-1** below.  Because the North Carolina board's only authority with respect to the unauthorized practice of dentistry was to refer a case to other officials for prosecution, and because the board did not adopt a rule that could be challenged, the only way the non-dentist teeth-whitening providers could have obtained judicial review of the "cease and desist" orders was as a defense to criminal prosecution.  Also relevant to the discussion in **I-D-1-b**, challenges to board actions do not go to the North Carolina Office of Administrative Hearings to be heard by an administrative law judge, as do those for most other agencies, but instead the hearings are conducted by a presiding officer chosen by the board and the case is decided by a majority of the board.[5]  (The first and second differences are relevant to the discussion in **I-D-3** below.)

Other aspects of North Carolina law differentiate its dental board from the relevant TMB attributes examined in **I-D-2** below.  First, while isolated North Carolina statutes have "sunset" provisions, which are simply expiration dates,[6] the dental board's statute does not[7] and that state's law has nothing equivalent to the exhaustive sunset review process in Texas.  Second, North Carolina administrative law does not include the concept of adoption by reenactment.[8]

---

[5]  N.C. GEN. STAT. § 150B-40.  *See Homoly v. N. Ca. State Bd. of Dental Exam'rs*, 468 S.E.2d 481, 482-83 (N.C. App.), *pet. denied,* 471 S.E.2d 71 (N.C. 1996).

[6]  *E.g.*, N.C. GEN. STAT. § 160A-239.1.

[7]  The board's governing statute proclaims that, "The North Carolina State Board of Dental Examiners . . . is hereby continued as the agency of the State for the regulation of the practice of dentistry in this State."  N.C. GEN. STAT. § 90-22.  However, it was last amended in 1981.  N.C. GEN. STAT. ANN. § 90-22 Credits (West).

[8]  A WestLaw keynote search under 15A ADMINISTRATIVE LAW AND PROCEDURE k436 "Reenactment or incorporation of statute construed, effect of," found numerous Texas cases but none for North Carolina.

**D. In Contrast to the North Carolina Dental Board, Active State Supervision Provides Realistic Assurance that the TMB Promotes State Policy and Removes the Risk of the Defendants Promoting their Personal Interests.**

**1. The state actively supervises the TMB through SOAH and judicial review.**

**a. The instant case requires this Court to answer the judicial review question left open by the Supreme Court.**

As noted in **I-C** above, because the contested action by the North Carolina dental board did not involve the adoption or enforcement of a board rule, the only judicial review conceivably available for the affected parties was the risky measure of incurring prosecution. However, the Supreme Court has recognized that more robust state judicial review might provide sufficient state supervision. In a decision cited nine times by the majority in *NCSBDE*, the Court acknowledged that it had "not previously considered whether state courts, acting in their judicial capacity, can adequately supervise private conduct for purposes of the state-action doctrine." *Patrick v. Burget*, 486 U.S. 94, 103 (1988).

Although the *Patrick* case did "not require us to decide the broad question whether judicial review of private conduct ever can constitute active supervision," *id*. at 104, nor has any case since then, the Court's reasoning, combined with the guidance in *NCSBDE*, shows why the judicial review available to scrutinize TMB rules and actions constitutes active state supervision. In *Patrick*, the Court concluded that "judicial review of privilege-termination decisions in Oregon, *if such review exists at all*, falls far short of satisfying the active supervision requirement." *Id*. (emphasis added).

The fatal defects in Oregon's hypothetical judicial review were (1) "Oregon has no statute expressly providing for judicial review of privilege terminations"; (2) the Court could find "no case in which an Oregon court has held that judicial review of peer-review decisions is available";

11

and (3) state judicial decisions had indicated in dictum that if a court were to review the kind of action at issue in that case, it could do no more than determine whether reasonable procedures were followed and some evidence supported the decision. *Id*. at 104-05. But because state courts had no authority to "to determine whether [the action at issue] *accorded with state regulatory policy*," that "kind of review would fail to satisfy the state-action doctrine's requirement of active supervision." *Id*. at 105 (emphasis added).[9]

> **b. SOAH and judicial review of TMB rules and actions provide the safeguards missing from Oregon's putative judicial review of hospital peer review decisions.**

Texas law expressly provides for review before the State Office of Administrative Hearings ("SOAH") and state courts of the substance of TMB rules and decisions, by quasi-judicial and judicial officials who are not themselves active market participants and who have the power to invalidate or circumscribe the rule or action at issue. *See NCSBDE*, 135 S. Ct. at 1116. In their amended pleadings the plaintiffs add only the conclusory assertion that, "There is no active supervision of the TMB . . . by the Texas judiciary." Doc. 55 ¶ 9. However, on Rule 12(b) motions, courts "do not accept as true 'conclusory allegations . . . or legal conclusions.'" *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 209 (5th Cir. 2010) (citing *Iqbal*, 556 U.S. at 664).

> **(1) Judicial review of TMB rules provides active state supervision.**

First, a rule of the TMB is subject to direct judicial review, which may be invoked by any party adversely affected by the rule, including "its threatened application," as exceeding the board's authority under state law. TEX. GOV'T CODE § 2001.038. To determine the validity of a

---

[9] This is exactly how federal circuit courts have understood the ruling subsequently. *Miller v. Ind. Hosp.*, 930 F.2d 334, 337 (3rd Cir. 1991); *Pinhas v. Summit Health, Ltd.*, 894 F.2d 1024, 1029 (9th Cir. 1989), *aff'd*, 500 U.S. 322 (1991).

board rule under section 2001.038(a), the state court as a matter of law must determine whether the members of the board are promoting state policy rather than any other interest.[10]   *Tex. Orthopaedic Ass'n v. Tex. State Bd. of Podiatric Med. Exam'rs*, 254 S.W.3d 714, 719-20 (Tex. App.—Austin 2008, pet. denied) ("when determining whether an agency's rule is valid, we must ascertain whether the rule is contrary to the relevant governing statutes, or whether the rule is in harmony with the general objectives of the statutes involved") (citations omitted).

> An agency's rules must comport with the agency's authorizing statute.  A state administrative agency has only the authority expressly provided by statute or necessarily implied in order to carry out the express powers the legislature has given it.  An agency may not exercise what is effectively a new power on the theory that such exercise is expedient for the agency's purposes.

*Harlingen Family Dentistry, P.C. v. Tex. Health & Human Servs. Comm'n*, 452 S.W.3d 479, 481-82 (Tex. App.—Austin 2014, pet. filed) (citations omitted).  The TMB thus "derive[s] its authority and its efficacy from the legislative command of the state and [i]s not intended to operate or become effective without that command."  *Parker*, 317 U.S. at 350.

The state judiciary's authority to realistically assure that state health agencies and professional licensing boards are promoting state policy is not merely potential or hypothetical. Texas courts have not hesitated to invalidate state regulations when they are found to exceed the agencies' statutory authority.  As the *amicus* Federation of State Medical Boards has pointed out, Teladoc has utilized this very judicial review to invalidate the defendants' application of the

---

[10]  To facilitate this judicial review, and to further impress upon licensing board members that they are accountable to state policy, a board rule is voidable unless it is enacted in substantial compliance with, *inter alia*, the requirement that the rule be accompanied by a "reasoned justification for the rule," which includes, *inter alia*, "a summary of the factual basis for the rule as adopted which demonstrates a rational connection between the factual basis for the rule and the rule as adopted; and . . . a certification that the rule, as adopted, has been reviewed by legal counsel and found to be a *valid exercise of the agency's legal authority*."  TEX. GOV'T CODE §§ 2001.035, 2001.033(a) (emphasis added). *Compare Parker*, 317 U.S. at 347 ("the Commission is authorized to approve [the program at issue] after a public hearing and a finding that 'the program is reasonably calculated to carry out the objectives of this act.'")

contested rule's 2003 wording.  Doc. 30 at 5-6.  (Indeed, it was to comply with the mandate of the Austin Court of Appeals decision obtained by Teladoc that the defendants adopted the rule that the same plaintiffs now attack on antitrust grounds.)  *Accord Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*, 458 S.W.3d 552, 557-59 (Tex. App.—Austin 2015, no pet. his.) (invalidating state health professional licensing board rule as exceeding its statutory authority); *Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*, 375 S.W.3d 464, 481 (Tex. App.—Austin 2012, pet. denied) (same); *Tex. Orthopaedic Ass'n*, 254 S.W.3d at 722-23 (same).

### (2) SOAH and judicial review of TMB disciplinary actions provide active state supervision.

Independent quasi-judicial administrative review and judicial review are available to challenge a disciplinary action enforcing a rule said to be in excess of a board's statutory authority. TEX. OCC. CODE § 164.009.  Unlike the North Carolina circumstances examined in **I-C** above, the TMB unquestionably has jurisdiction over Texas licensed physicians.

Unlike the non-dentist teeth-whitening providers in *NCSBDE*, Texas licensed physicians need not invite criminal prosecution in order to challenge disciplinary actions they contend serve only the personal interests of board members rather than the policies of the state.  In direct contrast to the facts of *NCSBDE*, in which the dental board's "cease-and-desist letters threatening criminal liability" did not "invoke oversight by a politically accountable official," 135 S. Ct. at 1116, a Texas licensed physician may seek judicial review of a cease and desist order.[11]  22 T.A.C. § 187.83(f).

---

[11]  In another contrast to the North Carolina dental board, the TMB has the statutory authority to issue a cease and desist order to unlicensed individuals for violations of the Texas Medical Practices Act or TMB rules.  TEX. OCC. CODE § 165.052.

Also unlike the North Carolina system, the TMB contested case that precedes judicial review is heard by a non-market-participant administrative law judge employed by SOAH, a separate agency.  TEX. OCC. CODE §§ 164.003, 165.002, 164.007(a).  A newly selected board member may not take office without first receiving training on his/her role and responsibilities under the Administrative Procedures Act.  *Id*. at 152.010(a)(7).  The TMB "may not supervise the administrative law judge" and "may not attempt to influence the finding of facts or the administrative law judge's application of the law in a contested case except by proper evidence and legal argument."  TEX. GOV'T CODE § 2001.058(b) & -(d).  Once the ALJ has issued a decision, the TMB, unlike most other agencies (*id*. at § 2001.058(e)), "may not change a finding of fact or conclusion of law or vacate or modify an order of the administrative law judge," but is allowed instead only to "determine the appropriate action or sanction" (if any).  TEX. OCC. CODE § 164.007(a-1).

After the SOAH decision an aggrieved party may obtain judicial review.  TEX. GOV'T CODE § 2001.171.  At the culmination of that review, the state court "*shall* reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . in excess of the agency's statutory authority."  *Id*. at § 2001.174(2)(B) (emphasis added).

In the *Parker* immunity analysis, the nature and extent of state supervision that is required depends on the type of board action at issue.  In *NCSBDE*, the disputed action was neither authorized by state statute nor subject to state review of any kind.  As a matter of law, board rules and actions that are subject to the review provided by sections 2001.038 and/or 2001.174 represent the conduct of the State of Texas itself and are thereby beyond the reach of federal antitrust law.  A holding that this degree of state review does not constitute active state supervision would result

15

in the substitution of federal judicial oversight, of any state licensing board rule or action that is alleged to be "anticompetitive," for state regulation of health care professions.  That affront to principles of federalism was never intended by the Sherman Act or the *NCSBDE* decision.

### 2.  The state actively supervises the TMB through Legislative oversight.

#### a.  The Legislature oversees the TMB through sunset review and adoption by reenactment.

As discussed in **I-B** above, because federal antitrust law was not meant to restrain "official action directed by a state," including "activities directed by [a state's] legislature," a state professional regulatory board's actions are beyond the reach of an antitrust claim when "the State effectively has made this conduct its own."  *NCSBDE*, 135 S. Ct. at 1116; *Parker*, 317 U.S. at 350-51.  In the North Carolina dental board case, "there [wa]s no evidence [t]here of any decision by the State to . . .  concur with the Board's actions."  *NCSBDE*, 135 S. Ct. at 1116.  By contrast, in various ways, separately and cumulatively, the Texas Legislature has made the actions at issue in this suit the conduct of the state.

First, through the sunset review process, the Texas Legislature has ratified the TMB's interpretation and application of TEX. OCC. CODE § 164.051(a)(6) ("The board may . . . take disciplinary action against a person [who] fails to practice medicine in an acceptable professional manner consistent with public health and welfare"), pursuant to which the board adopted 22 T.A.C. § 190.8(1)(L).  Although at the end of 2014 a state court held, in retrospect, that the board had not used the correct words ("including" instead of "such as") to express its interpretation, in its 1999 policy and its 2003 rule, there can be no doubt that the TMB considered prescribing drugs without a physical examination to be an unacceptable practice inconsistent with public health and welfare. Doc. 21-1 at 7-8 (referring to *Teladoc, Inc. v. Tex. Med. Bd.*, 453 S.W.3d 606 (Tex. App. – Austin

16

2014, pet. filed)).  Between 2000 and the 2005 legislative session, the TMB regularly disciplined physicians for prescribing medication without a proper diagnosis based on  a physical examination of the patient.[12]  Doc. 21-13 at 1-28; docs. 21-20 through 21-24.

"When the legislature reenacts without substantial change a statute that has been previously construed by an agency charged with its execution, a court should ordinarily adopt the agency construction." *Sw. Life Ins. Co. v. Montemayor*, 24 S.W.3d 581, 585-86 (Tex. App. – Austin 2000, pet. denied) (citing *Reed v. State Dep't of Licensing & Regulation*, 820 S.W.2d 1, 3 n. 2 (Tex. App.—Austin 1991, no writ)).[13]  At the culmination of the 2005 sunset review of the TMB, while making numerous changes to the Texas Medical Practices Act, the Legislature continued section 164.051(a)(6) without alteration.[14]

In contrast to the North Carolina dental board, as noted in **I-C** above, the Texas Medical Board is subject to sunset review.  TEX. OCC. CODE § 151.004.  Under this process, an agency goes out of existence on a specified date unless the Legislature affirmatively reenacts its enabling statute.[15]  Prior to the agency's terminal legislative session, it is thoroughly examined by the Sunset Commission, which consists of five senators, five representatives, and two public members.  TEX. GOV'T CODE § 325.003(a).  A public member of the commission may not be anyone who is

---

[12]  Note that for every agreed or adjudicated judgment there will necessarily have been many more communications by the TMB to doctors expressing disapproval of prescribing without a physical exam, in cases that for various reasons were resolved short of a final judgment.

[13]  "If, however, the legislature reenacts without substantial change a statute of doubtful construction that has been previously construed by an agency charged with its execution, a court should ordinarily give the statute the same construction previously given by the agency" (citing *Humble Oil & Refining Co. v. Calvert,* 414 S.W.2d 172, 180 (Tex. 1967)).

[14]  S.B. 419 (http://www.legis.state.tx.us/tlodocs/79R/billtext/html/SB00419F.HTM).

[15]  Steven Ogle, *A Look at Sunset and How Stakeholders Can Effectively Participate in the Process*, 13 TEX. TECH ADMIN. L.J. 291, 294 (2012).

"regulated by a state agency that the commission will review during the term for which the individual would serve."  *Id*. at –(b).

The Commission reviews the agency using criteria set out in the sunset statute.  *Id*. at § 325.008(a)(3).  Significantly, the Commission must evaluate a professional licensing board such as the TMB according to, *inter alia*:

- Whether it "**serves** a meaningful, defined **public interest**";

- Whether it "provides the least restrictive form of regulation that will adequately **protect the public interest**";

- "[T]he extent to which the regulatory objective of the occupational licensing program may be achieved through **market forces**"; and

- "[T]he impact of the regulation, including the extent to which the program stimulates or restricts **competition** and affects **consumer choice and the cost of services**."

*Id*. at § 325.0115(b) (emphasis added).  The 2005 sunset review closely and comprehensively examined the TMB and reported its findings to the Legislature, which reenacted the board's enabling legislation without overriding its interpretation of TEX. OCC. CODE § 164.051(a)(6).[16] The Legislature thereby endorsed the TMB's rules and actions, generally and of relevance to this suit, as promoting state policy rather than private interests.  The federal antitrust laws do not empower this Court to second guess that state legislative judgment.

In their amended complaint, the plaintiffs have added new paragraph 126, in which they assert, "on information and belief," that "the Sunset Review Commission did not review the

---

[16]    *See* "Final Results from Last Sunset Report," https://www.sunset.texas.gov/reviews-and-reports/agencies/texas-state-board-medical-examiners.

substance of any TMB rule or policy challenged in this lawsuit" in 2005 and that the "Sunset Review Commission does not have the power to veto or modify any rule adopted by the TMB." Doc. 55 ¶ 126. The plaintiffs have missed the point of this discussion.

First, the state's obligation under antitrust law, as shown above, is to have in place a system that provides "*realistic assurance*" that state regulators overseeing a profession to which they belong will promote state policy rather than their private professional interests. Neither logically nor legally does "realistic assurance" require certainty that each of the hundreds of TMB rules,[17] policies, and interpretations will be examined or that examiners must document every item reviewed. Instead, realistic assurance is provided by a process in which the agency is on notice that all of its rules, policies, actions, and interpretations are subject to thorough scrutiny— moreover, scrutiny expressly aimed at determining whether any agency policies are anticompetitive. Such a system is reasonably calculated to deter most "market participant" regulators from subordinating state policy to self-interest, thereby minimizing "the *risk* that active market participants will pursue private interests in restraining trade." *NCSBDE*, 135 S. Ct. at 1114 (emphasis added).

Second, it is immaterial that the Sunset Commission does not itself have the power to veto or modify any rule adopted by the TMB because the Legislature unquestionably does have that power. It is the Legislature that constitutes the Commission and to the Legislature that the Commission reports. And it is the Legislature that must act affirmatively on the Commission's report if the agency is to continue to operate.

---

[17] TMB rules comprise 40 chapters, each of which contains numerous sections and subsections. 22 T.A.C. part 9.

Third, of course the 2005 sunset review could not have covered rules that had not yet been adopted.  But it is indisputable, as shown above, that the TMB's interpretation and application of TEX. OCC. CODE § 164.051(a)(6) was well established by that time.  In the absence of clear and convincing evidence to the contrary, the Court must presume that the commissioners and legislators properly discharged their duties – *i.e.*, that they examined every aspect of the TMB that was relevant to sunset review.  *E.g.*, *see 10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 725 n. 79 (5th Cir. 2013); *accord Nat'l Healthcare Invs., Inc. v. State of La.*, 2002 WL 663780, *1 (5th Cir. 2002) (per curiam).

Finally, the plaintiffs' amended pleadings show (accurately in this instance) that the Legislature's next sunset action pertaining to the TMB will be in 2017.  Doc. 55 ¶ 126 (first two sentences).  That means that the early stages of sunset review have already begun.  As part of the process, the board has been instructed to describe "key obstacles' that "impair [its] ability to achieve its objectives" and to "[d]iscuss any changes that could impact [its] key functions in the near future (*e.g*., changes in federal law or outstanding court cases)."  Goode decl., att. C at 2 (§§ G-H)  Consequently, the Court and plaintiffs may be sure that the rules and issues in dispute in this suit will be reviewed.  Under the authorities discussed above, as a matter of law, that review will culminate in the state's ratification, rejection, or alteration of the rules at issue.

### b.  The Legislature oversees the TMB through review of proposed rules.

Next, Legislative oversight is also provided through the statutory requirement that every TMB proposed rule is obtained by the presiding officer of each house and referred "to the appropriate standing committee [of the House and Senate] for review before the rule is adopted."  TEX. GOV'T CODE § 2001.032(a)-(b).  "On the vote of a majority of its members, a standing committee may send to a state agency a statement supporting or opposing adoption of a proposed

rule." *Id.* at –(b).  While a "negative option" might not alone suffice for active state supervision in all cases, this provision, as a supplement and complement to the judicial and legislative processes outlined above, further strengthens the realistic assurance that the defendants are promoting state policy over private interests.

In this regard, it is important to understand the circumstances under which the Supreme Court has found sole reliance on a "negative option" insufficient.  In *Ticor*, the states in question licensed "rating bureaus," which were "private entities organized by title insurance companies to establish uniform rates for their members."  *F.T.C. v. Ticor Title Ins. Co.*, 504 U.S. 621, 628 (1992).  In each state, "the rating bureau filed rates for title searches and title examinations with the state insurance office," which "became effective unless the State rejected them within a specified period, such as 30 days."  *Id.* at 629.

The Supreme Court held that, "Where prices or rates are set as an initial matter by private parties, subject only to a veto if the State chooses to exercise it, the party claiming the immunity must show that state officials have undertaken the necessary steps to determine the specifics of the price-fixing or ratesetting scheme."  *Id.* at 638.  It further concluded that the states' argument, "that as a matter of law in those States inaction signified substantive approval," could not "be reconciled, however, with the detailed findings, entered by the ALJ and adopted by the [Federal Trade] Commission, which demonstrate that the potential for state supervision was not realized in fact." *Id.*  "Because of the state agencies' limited role and participation, state judicial review was likewise limited."  *Id.* at 638-39 (citing *Patrick,* 486 U.S. at 103-05).

Of significance for the instant case, the Court identified the fatal defects that prevented the states from relying solely on "negative option" supervision:

This case involves horizontal price fixing under a vague *imprimatur* in form and agency inaction in fact. *No antitrust offense is more pernicious than price fixing.* **In this context**, we decline to formulate a rule that would lead to a finding of active state supervision where in fact there was none. *Our decision should be read in light of the gravity of the antitrust offense*, the involvement of private actors throughout, and the clear absence of state supervision. We do not imply that some particular form of state or local regulation is required to achieve ends *other than the establishment of uniform prices*.

*Id*. at 639 (emphasis added).  "*In the circumstances of this case*, however, we conclude that the acts of [the rating bureaus] are not immune from antitrust liability."  *Id*. at 640 (emphasis added).

Even when the allegations in the present action are construed in the plaintiffs' favor, this is not a price-fixing case.  For the reasons shown in **D-3** below, the defendants are not private parties, certainly not when compared to the ratings bureaus in *Ticor*.  And as shown in this section and the preceding section, state supervision has been far from clearly (or even obscurely) absent. As shown in **D-1** above, judicial review is robust.

In their amended complaint, the plaintiffs have added the allegation, "on information and belief," that "neither New Rule 174 nor proposed New Rule 190.8 were referred to or reviewed by a standing committee in either house of the state legislature."  Doc. 55 ¶ 125.  Under section 2001.032(a)-(b), the Speaker of the House and Lieutenant Governor obtain the proposed rules from the Secretary of State, with whom the board is required to file them, without the board's having to "refer" them to the committees.[18]  However, prior to the adoption of the challenged amendments to chapter 174 and section 190.8, TMB staff, on their own initiative, sent copies to key legislators, including chairs and members of the relevant committees, and the executive director personally met with the appropriate legislators to discuss the proposed rules.  Goode and Robinson decls.

---

[18] TEX. GOV'T CODE §2001.023.

### 3. Other relevant features of the TMB realistically assure the promotion of state policy over private interests.

As noted in **I-C** above, the plaintiffs' only basis for insisting that the defendants are subject to the *Midcal* active state supervision requirement is the fact that a majority of the TMB belong to the same overarching medical profession as the physicians they regulate. However, because of important characteristics that set the TMB apart from the board examined in *NCSBDE*, the defendants are not the kind of "non-sovereign" actors whose special interests raise the specter of regulatory capture.

First, in contrast to the North Carolina dental board, members of the TMB are all appointed by the Governor and confirmed by the Senate. TEX. OCC. CODE § 152.002(a). Consequently, unlike their North Carolina dental counterparts, who are chosen by and answerable only to their professional peers, the defendants are directly accountable to Texas state government.[19] Note that in *Parker*, eight of the nine members of the immunized state commission were appointed by the state's governor and confirmed by its senate. *Parker*, 317 U.S. at 346.

Next, in further contrast to the facts of *NCSBDE*, the TMB has express statutory authority to regulate the medical practices of the plaintiffs. TEX. OCC. CODE § 151.056. Moreover, state statute authorizes the defendants to "adopt rules necessary to . . . ensure that patients using telemedicine medical services receive appropriate, quality care," including regulations to "require a face-to-face consultation between a patient and a physician providing a telemedicine medical

---

[19] It is also worth noting that while dentists made up three-fourths of the North Carolina board, physicians account for only a little more than three-fifths of the TMB. When the non-physician members of the board are united, they need only three of the twelve physicians to join them in order to form a majority.

service . . . if the physician has never seen the patient." *Id*. at § 111.004.[20]  These provisions more than satisfy the "clear articulation" criterion for *Parker* immunity.  *NCSBDE*, 135 S. Ct. at 1111.

The defendants in this case differ from their North Carolina dental counterparts in yet another relevant way.  None of the physician members of the TMB, who are all specialists, are in direct competition with the Teladoc physicians, who provide only general and family medicine services when working for Teladoc.  *See* plaintiffs' preliminary injunction exhibits P-5 through P-15 (which are matters of public record).  Doc. 10-1 at 128-29, 135-36, 142-43, 148-49, 154-55, 161-62; doc. 10-2 at 4-5, 10-11, 18-19, 25-26, 32-33.  Moreover, four of the physician members are on medical school faculties, which in their educator role gives them an additional interest in sound medical practice rather than the narrow economic interests of practitioners.  Doc. 10-1 at 130, 150, 156; doc. 10-2 at 20.

The "flexible and context-dependent" analysis necessarily contemplates a spectrum ranging from a purely private association pursuing its own interests at one end to a conventional state agency promoting state policy at the other end.  In this regard, it is important to note that prior to *NCSBDE*, the entities that were denied *Parker* immunity were organizations that had no other governmental functions or traits except for the specific regulatory power delegated to them by the state.  As examined above, in *NCSBDE*, the Supreme Court, while holding that formal designation as a state agency is not alone sufficient, called attention to many features (*not* shared by the TMB) of the North Carolina dental board that more closely resembled those of a private professional association.

---

[20]  The Board is also authorized to "adopt rules as necessary to . . . ensure that appropriate care is provided to Medicaid and Medicare patients who receive telemedicine medical services."  *Id*. at § 153.004(a)(1).

It follows that (along with fewer traits characteristic of private associations) the more attributes and functions a board has that are of the kind exclusive to governmental bodies, the further it is on the state agency end of the spectrum.  In addition to gubernatorial appointment and senate confirmation, discussed above, and board members' official oath to faithfully execute the duties of the office,[21] the TMB is subject to numerous obligations and limitations that apply ***only*** to a governmental body.  These include but are not limited to:

● The Open Meetings Law;[22]

● The Texas Public Information ("open records") Act;[23]

● Administrative Procedure Act requirements for rule-making and numerous other actions;[24]

● Due process, equal protection, free speech, and other constitutional requirements a private association does not have to observe;[25]

● Special requirements for procurement, purchasing, hiring, conflicts of interest, and ethics.[26]

---

[21]  TEX. CONST. art. XVI §1.

[22]  TEX. GOV'T CODE ch. 551.  It has never been in doubt that professional licensing boards are "governmental bodies" within the meaning of the statute, § 551.001(3)(A).  *E.g.*, *Tex. State Bd. of Pub. Accountancy v. Bass*, 366 S.W.3d 751, 759 (Tex. App.—Austin 2012, no pet.); *Ferris v. Tex. Bd. of Chiropractic Exam'rs*, 808 S.W.2d 514, 515 (Tex. App.—Austin 1991, writ denied) ("The Board is subject to the provisions of the Act."); *Rogers v. State Bd. of Optometry*, 619 S.W.2d 603, 605 (Tex. Civ. App.—Eastland 1981, no writ) ("substantial compliance with the act is the standard by which the Board's performance is to be measured").

[23]  TEX. GOV'T CODE ch. 552.  In litigation under the Act, the issue has been not whether professional health licensing boards are "governmental bodies" within the meaning of the statute, § 552.003(1)(A)(i), but whether the records at issue fell within statutory exceptions to disclosure.  *E.g.*, *Abbott v. Tex. Bd. of Nursing*, 2010 WL 392335, *1 (Tex. App.—Austin 2010, no pet.); *Tex. State Bd. of Veterinary Med. Exam'rs v. Giggleman*, 408 S.W.3d 696, 697-98 (Tex. App.—Austin 2013, no pet.); *Abbott v. Tex. State Bd. of Pharmacy*, 391 S.W.3d 253, 254 (Tex. App.—Austin 2012, no pet.).

[24]  TEX. GOV'T CODE chs. 2001-2002.  If the TMB were not a "state agency" within the meaning of TEX. GOV'T CODE § 2001.003(7), the plaintiffs could not have brought their prior state court action (doc. 55 ¶¶ 106-10).

[25]  *E.g.*, *Granek v. Tex. State Bd. of Med. Exam'rs*, 172 S.W.3d 761, 772 (Tex. App.—Austin 2005, no pet.) ("The due process protections of our federal and Texas constitution apply to agency proceedings.").

[26]  TEX. GOV'T CODE chs. 572 (personal financial disclosure, standards of conduct, and conflict of interest), 2005 (permit processing), 2051 (government documents, publications, and notices), 2052 (state agency reports and publications), 2101 (accounting procedures), 2155 (purchasing general rules and procedures); *see also id.* § 2262.053 (mandatory training on contracting requirements).

To reinforce these requirements, an appointee to the TMB "may not vote, deliberate, or be counted as a member in attendance at a meeting of the board until the person completes a training program" that includes, *inter alia*, "the requirements of laws relating to open meetings, public information, administrative procedure, and conflicts of interest; and any applicable ethics policies adopted by the board or the Texas Ethics Commission." TEX. OCC. CODE § 152.010(a)(7)-(8). A person may not serve on the board or be employed by the TMB if he or she, or his/her spouse, "is an officer, employee, or paid consultant of a Texas trade association in the field of health care or a national organization incorporated to represent the entire profession licensed to practice medicine in this state or the United States." TEX. OCC. CODE §§ 152.004(c), 152.055. (A private association may have its own requirements, such as for rule-making and ethics, but they are not enforceable in court to the extent that foregoing obligations are.)

The foregoing facts go to the heart of antitrust law and *Parker* immunity. The purpose of active state supervision is to provide realistic assurance that regulators will not succumb to the temptation to use state power to serve personal financial interests. *NCSBDE*, 135 S. Ct. at 1113 (the "active supervision requirement, in particular, is an essential condition of state-action immunity when a nonsovereign actor has 'an incentive to pursue its own self-interest under the guise of implementing state policies'") (brackets omitted), 1114 ("active market participants, who possess singularly strong private interests, pose the very risk of self-dealing *Midcal*'s supervision requirement was created to address"). Because they are selected through and accountable to the political process and because they participate in (at most) a different part of the "market" than the Teladoc physicians, the TMB physician members lack the "economic incentives to restrain competition" (*id*. at 1114) that are the concern of antitrust law.

26

### 4. The parallels between the contested rules and state statutes realistically assure the promotion of state policy over private interests.

Finally, the TMB rules at issue in this suit exactly match various state and federal statutory requirements, which are the quintessential manifestation of public policy. *Id*. at 1110. There can hardly be a more realistic assurance that board members are carrying out state policy than when their rule duplicates the product of the legislative process, which as a matter of law is "electorally accountable and lack[s] the kind of private incentives characteristic of active participants in the market." *Id*. at 1112.

For example, for Medicaid purposes, Texas statute defines "telemedicine" exactly as the TMB does, to include, *inter alia*, "diagnosis or consultation by a physician" via "the use of advanced telecommunications technology, *other than telephone* or facsimile technology."[27] TEX. GOV'T CODE § 531.001(8) (emphasis added); *compare* 22 T.A.C. §§ 174.2(10), 174.7(a). State Medicaid law further requires the Texas Health and Human Services Commission ("HHSC") to provide for reimbursement of services "provided through telemedicine by a physician who is assessing and evaluating the patient from a distant site" only if "a health professional acting under the delegation and supervision of that physician is present with the patient at the time of the visit." TEX. GOV'T CODE § 531.0217(c-1)(1); *compare* 22 T.A.C. §§ 174.7-174.8. Moreover, state statute authorizes the TMB, in consultation with HHSC, to "adopt rules as necessary to . . . define those situations when a face-to-face consultation with a physician is required after a telemedicine medical service." TEX. GOV'T CODE § 531.0217(i)(3). Further, the TMB, in consultation with

---

[27] A diversionary argument by the plaintiffs contends that because Teladoc's services are "telehealth" rather than "telemedicine," they therefore are not subject to this definition. However, Teladoc's services as described in the plaintiffs' pleadings are clearly encompassed by 22 T.A.C. § 174.2(10), which was not enjoined by this Court. The statutory definition of "telehealth" for Medicaid services also "requires the use of advanced telecommunications technology, other than telephone." TEX. GOV'T CODE § 531.001(7). The plaintiffs' paradoxical argument thus is that because they are in violation of state telehealth/telemedicine laws they are not subject to them.

HHSC and the Texas Department State Health Services, "*shall* adopt rules to establish supervisory requirements for a physician delegating a service to be performed by . . . a health professional who is authorized to be a telepresenter under Section 531.02163." *Id.* at § 531.0217(i-1); *compare* 22 T.A.C. § 174.7.

Pursuant to its statutory authority to regulate Medicaid funded telehealth and telemedicine services,[28] HHSC has promulgated rules that impose on Medicaid-funded telemedicine providers, including Teladoc (doc. 55 ¶¶ 59, 87), the same requirements that the plaintiffs have challenged in this lawsuit.  1 T.A.C. §§ 354.1430-354.1432.  HHSC rules expressly require that:

> Before receiving a telehealth service, the patient must receive an in-person evaluation for the same diagnosis or condition, with the exception of a mental health diagnosis or condition. . . . For the continued receipt of a telehealth service, the patient must receive an in-person evaluation at least once during the previous 12 months by a person qualified to determine a need for services.

*Id.* at § 354.1432(2)(E)-(F); *compare* 22 T.A.C. § 190.8(1)(L)(i)(II) (as amended April 10, 2015). Consequently, the challenged TMB rules have been replicated for Medicaid by an agency that "exercise[s] a wide range of governmental powers across different economic spheres, substantially reducing the risk that it would pursue private interests while regulating any single field."[29] *NCSBDE*, 135 S. Ct. at 1112-13.

The challenged TMB rules are also in accord with statutes and/or regulations in many or most other states.  A report by the U.S. Centers for Disease Control and Prevention ("CDC") shows how closely aligned the contested TMB rules are with state laws generally.

---

[28] Tex. Gov't Code §531.0216.

[29] For example, in addition to funding and making rules for health-related services in certain contexts, HHSC also administers the food stamps program and cash assistance payments such as Social Security disability income.

Forty-one states and the District of Columbia have one or more laws that require a prescriber or dispenser to ensure that prescriptions for medications are based on an examination of the patient.  States with these laws may require a physical examination as part of *prescribing* regulations, or may prohibit pharmacists and physicians from *dispensing* certain types of drugs if there is doubt the drugs were prescribed following a physical exam. . . . **Thirty-six states and the District of Columbia have physical examination laws that apply to prescriptions of all drug types or any prescription (includes controlled substances).** . . . Many states and the District of Columbia have laws that require a physical examination by reference to a practitioner-patient relationship.  Some states do this by requiring a relationship between the practitioner and the patient, and then provide a definition of "practitioner-patient" or "physician-patient" (or some other similar combination) that includes a physical examination requirement elsewhere in statute or regulation. . . . Many states, and the District of Columbia, that require examinations before prescribing have also enacted provisions prohibiting practitioners from prescribing based solely on electronic patient questionnaires.

"Prescription Drug Physical Examination Requirements"[30] at 2, 4, 6, 9 (italics original, boldface added, footnotes omitted).  Eighteen of the thirty-six states that require a physical examination for the prescription of any kind of drug do so by statute.  *Id.* at 4 n. 21.

The first exhibit to this motion presents a non-exclusive list of 24 states that require a physical examination for the prescription of any kind of drugs, of which nine do so by statute.[31]  Because the CDC report excluded statutes that, without express language to the effect, have been read "to define the patient-practitioner relationship to include a physical examination through judicial interpretation," *id.* at 2 n. 5,[32] there are undoubtedly more states with this requirement than are listed in the report.  Another survey shows that at least 27 states exclude telephone-only

---

[30]  http://www.cdc.gov/phlp/docs/pdpe-requirements.pdf

[31]  California requires an "an appropriate prior examination."  Cal. Bus. & Prof. Code §§ 2242(a), 2242.1(a).  However, it is listed by the CDC as a state requiring a physical examination, so presumably that is how the provision has been interpreted.  In addition to the state laws listed in the Exhibit, *see also* Ill. Admin. Code tit. 89, § 140.403(b) (telemedicine rules require that a "physician or other licensed health care professional must be present at all times with the patient at the originating site"); N.Y. Pub. Health Law § 2999-cc ("Remote patient monitoring shall be ordered by a physician . . . with which the patient has a substantial and ongoing relationship.").

[32]  Citing *State v. Kane*, 586 S.W.2d 812, 814-15 (Mo. Ct. App. E.D. 1979).

consultations from permitted telemedicine and/or telehealth (often using the terms interchangeably).[33]

Similarly to the challenged section 190.8(2)(L)(i)(II)(-c-), which applies to both dangerous drugs and controlled substances, federal law prohibits the prescription of a controlled substance except by a physician "who has conducted at least 1 in-person medical evaluation of the patient." 21 U.S.C. § 829(e)(2)(A).[34]  As under Texas Medicaid law and the contested section 174, services provided only over the telephone do not qualify as Medicare-reimbursable "telehealth" services. 42 C.F.R. § 410.78(a)(1), -(3), -(b).

As a consequence of all the foregoing, state action immunity compels the dismissal of the plaintiffs' antitrust claim for lack of jurisdiction (as well as, in the alternative, for failure to state a claim on which relief may be granted against these defendants).

## II.     The Plaintiffs Cannot State A Viable Claim For Relief On Their Interstate Commerce Clause Claim.

The plaintiffs assert a cause of action under 42 U.S.C. § 1983, alleging that the defendants have violated the "dormant Commerce Clause."[35]  Doc. 55 at 35 ("Count II").  For the reasons shown in doc. 21 at 13-16, the plaintiffs' allegations do not describe state discrimination against

---

[33]     American Health Lawyers Association, "Telehealth: A Fifty State Survey," https://www.healthlawyers.org/store/Pages/Product-Details.aspx?productid=%7B30338595-BCDE-E411-93B6-00505692001D%7D.  *See also PhoneDOCTORx, LLC v. Healthbridge Mgmt., Inc.*, 58 F. Supp.2d 152, 162 n. 8 (D. Mass. 2014) (identifying "[a]t least 16 other states," in addition to Massachusetts, in which the legal definition of telemedicine "excludes 'audio-only telephone, facsimile machines or email'") (*see* note 27 above).

[34]  The statute makes an exception from this restriction for "telemedicine."  *Id.* at –(e)(3)(A).  However, Teladoc's model would not qualify as "telemedicine" under the statute's definition of that term.  *See* 21 U.S.C. § 802(54).

[35]  The plaintiffs also cite § 1983 as an alternate basis for jurisdiction.  Doc. 1 ¶ 38.  *But see Daigle v. Opelousas Health Care, Inc.*, 774 F.2d 1344, 1346-47 (5th Cir. 1985) (§ 1983 does not create jurisdiction).

interstate commerce.  *Especially see* doc. 30 (Federation of State Medical Board *amicus* brief) at 9-11 (citing, *inter alia*, *United Haulers* and *Pharm. Research & Mfrs.*, *infra*).

Section 1983 was enacted under section 5 of the Fourteenth Amendment.  *Familias Unidas v. Briscoe*, 619 F.2d 391, 405 (5th Cir. 1980).  That section authorizes Congress "to enforce, by appropriate legislation, the provisions of *this* article."  U.S. CONST. amend. XIV § 5 (emphasis added).  "The 'provisions of this article,' to which § 5 refers, include the Due Process Clause of the Fourteenth Amendment."  *Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. at 637.  Thus, "for Congress to invoke § 5, it must identify conduct transgressing *the Fourteenth Amendment's substantive provisions*, and must tailor its legislative scheme to remedying or preventing such conduct."  *Id*. at 639 (emphasis added).  Consequently, the allegation of a violation of the dormant Commerce Clause cannot state a claim under sec. 1983.

To state a claim for a dormant Commerce Clause violation, assuming without conceding that it can be asserted under section 1983, the plaintiffs must allege and show, contrary to the contention of their antitrust claim, that when the defendants adopted the rules at issue, they were acting **as and for the State of Texas**.

> The dormant Commerce Clause restricts certain *state regulation* of interstate commerce. . . . In general, a state regulates when it *exercises governmental powers* that are *unavailable to private parties*.

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 261 F.3d 245, 255 (2nd Cir. 2001) (emphasis added), *aff'd*, 550 U.S. 330 (2007).  "[T]he Commerce Clause [i]s an implicit restraint on *state authority*."  *Id*., 550 U.S. at 338 (emphasis added).

When a state regulation neither directly regulates nor discriminates against interstate commerce, federal courts judge the rule by the "*Pike* test."  *Pharm. Research & Mfrs. of Am. v.*

*Cnty. of Alameda*, 768 F.3d 1037, 1040 (9th Cir. 2014) (citing *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 (1970)).  "Direct regulation occurs when a state law directly affects transactions that take place across state lines or entirely outside of the state's borders."  *Id*. at 1041.  "However, there is nothing unusual or unconstitutional per se about a state . . . regulating the in-state conduct of an out-of-state entity when the out-of-state entity chooses to engage the state . . . through interstate commerce."  *Id*. at 1043-44.

A rule is discriminatory in this context when, "on its face," it benefits in-state economic interests over out-of-state economic interests.  *United Haulers Ass'n, Inc.*, 550 U.S. at 338.  "Conversely, a statute that treats all private companies exactly the same does not discriminate against interstate commerce[,] even when only out-of-state businesses are burdened because there are no comparable in-state businesses."  *Pharm. Research & Mfrs.*, 768 F.3d at 1041.  Under such circumstances, a requirement that imposes comparable costs on in-state and out-of-state businesses alike is not discriminatory, "even though it would preclude [interstate] Plaintiffs' more profitable' method" of doing business.  *Id*. at 1045.

By the plaintiffs' own account, Teladoc provides service over the telephone to patients located in Texas, who are enrolled through Texas employers, health plans, and healthcare facilities. Doc. 55 ¶¶ 43, 46, 54-56.  It is undisputed in this case that less than a third of the 90 Teladoc physicians provide consultation from outside of Texas and that these transactions constitute only 16.5% of Teladoc interactions with Texas callers.[36]

---

[36]  *See* doc. 30 at 9-10 (citing doc. 10 at 23).

The burden on interstate commerce claimed by the plaintiffs is the "requirement of an in-person physical examination." *Id.* ¶ 157.[37]  However, a Teladoc physician physically located in San Antonio advising a user in Dallas is no less inconvenienced by the requirement than a Teladoc physician in Oklahoma City consulted by the same caller.  The principal contested rule, 22 T.A.C. § 190.8(1)(L), applies to all Texas licensed physicians, wherever they are located, whether they diagnose and prescribe through telemedicine/health or in office visits.  In their amended pleadings, the plaintiffs have added threadbare recitals of the elements of a dormant Commerce Clause cause of action, supported by mere conclusory statements[38] (doc. 55 ¶¶ 160-61, 163), but still plead no facts supporting a plausible inference of a significant burden on interstate commerce.

"When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, the Court has examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Pharm. Research & Mfrs.*, 768 F.3d at 1040 (brackets omitted).  "[U]nder *Pike,* a plaintiff must first show that the statute imposes a substantial burden before the court will determine whether the benefits of the challenged laws are illusory." *Id.* at 1044.  "Under the *Pike* test, we will uphold a nondiscriminatory statute . . . 'unless the burden imposed on interstate commerce is *clearly excessive* in relation to the putative local benefits.'" *United Haulers Ass'n, Inc.*, 550 U.S. at 346 (emphasis added, brackets omitted).

Because, even construing the pleadings in the plaintiffs' favor, they have not identified a substantial burden on interstate commerce, the Court need not compare the alleged burden to the local benefits.  But if it does, the plaintiffs' claim fails as a matter of law.  "Unlike private enterprise, government is vested with the responsibility of protecting the health, safety, and welfare

---

[37] *See also id.* ¶¶ 4, 7-8, 71, 103, 134-35.

[38] *See Gibson*, 700 F.3d at 233 (quoting *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555)).

of its citizens," so that "States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Id*. at 338, 342-43.  Consequently, "regulations that touch upon safety are those that the Supreme Court has been most reluctant to invalidate," so that "if safety justifications are not illusory, the Court will not second-guess legislative judgment about their importance in comparison with related burdens on interstate commerce." *Pharm. Research & Mfrs.*, 768 F.3d at 1045 (brackets and ellipse omitted) (quoting *Kassel v. Consol. Freightways Corp. of Del.,* 450 U.S. 662, 670 (1981)).

Even construing the plaintiffs' pleadings in their favor, they do not "allow the court to draw a reasonable inference"[39] that the burden on interstate commerce is so substantial that it is clearly excessive in relation to in-state benefits that are so illusory as to sustain the plaintiff's dormant Commerce Clause claim.

### III.    The Plaintiffs' Claims Attacking "New Rule 174" Are Time-Barred.

"[A] complaint that shows relief to be barred by an affirmative defense, such as the statute of limitations, may be dismissed for failure to state a cause of action." *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982) (affirming dismissal of antitrust counterclaim as time-barred).

In their application for preliminary injunction, the plaintiffs sought and the Court awarded only an injunction against 22 T.A.C. § 190.8, as amended in April 2015.  Docs. 10 at 23 and 44 at 20.  However, the plaintiffs also complain, and ask the Court to enjoin enforcement of, "New Rule 174," 22 T.A.C. chapter 174, effective October 17, 2010.  Doc. 55 ¶¶ 4, 166.  The plaintiffs allege that, "As a result of New Rule 174," which "took effect on October 17, 2010," Teladoc's video

---

[39] *Gibson*, 700 F.3d at 233 (citing *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556)).

consultation service "was no longer feasible or cost effective," forcing it to "reduce[] the output of medical services and increase[] price," so that since then it has had to "offer[] a more limited set of services to Texas businesses and patients." *Id.* ¶¶ 100-02.

This suit was originally filed on April 29, 2015.  Doc. 1.

### A.  The Plaintiffs' Antitrust Claim Attacking "New Rule 174" is Time-Barred.

"Because Plaintiffs seek only injunctive relief under [section 16 of the Clayton Act, 15 U.S.C. § 26], their federal antitrust claim is subject to the equitable doctrine of laches and not the four-year statute of limitations in section 4B of the Clayton Act, 15 U.S.C. § 15b." *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1084 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 1733 (2015).  However, "Under equitable principles the statute of limitations applicable to analogous actions at law is used to create a 'presumption of laches,'" which "'presumes' that an action is barred if not brought within the period of the statute of limitations." *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 365 (6th Cir. 1985) (citing cases from 2nd, 6th, 8th, & 10th circuits); *accord Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2nd Cir. 1996) ("once the analogous statute has run, a presumption of laches will apply and plaintiff must show why the laches defense ought not be applied in the case").

Consequently, "where the limitations period governing claims at law has expired, laches will bar the equitable claims, even if the defendant has not shown prejudice." *Horbach v. Kaczmarek*, 288 F.3d 969, 973 (7th Cir. 2002).  "[W]hen the suit is brought after the statutory time has elapsed, the burden is on the complainant to aver and prove the circumstances making it inequitable to apply laches to his case." *Conopco*, 95 F.3d at 191.

Laches not only incorporates the four year time period but also applies statute of limitations principles to determine when the cause of action accrues and when the period begins to run. *Oliver*,

751 F.3d at 1086 ("in applying laches, we look to the same legal rules that animate the four-year statute of limitations under [Clayton Act] section 4 B"); *Roemmich v. Eagle Eye Dev., LLC*, 526 F.3d 343, 352 (8th Cir. 2008) ("where a legal and equitable remedy exist for the same cause of action, equity will generally follow the limitations statute"); *Conopco*, 95 F.3d at 191 ("Although laches is an equitable defense, employed instead of a statutory time-bar, analogous statutes of limitation remain an important determinant in the application of a laches defense.").

Under these principles, the time limitation period began to run when the defendants adopted "New Rule 174." "Generally, an antitrust cause of action accrues, and the four-year statute of limitations begins to run, when a defendant commits an act that injures a plaintiff's business." *Kaiser Aluminum*, 677 F.2d at 1051; *accord Oliver*, 751 F.3d at 1086; *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902 (6th Cir. 2009). Thus, "the statute of limitations begins to run from the initial violation where defendants are accused of" enacting an anticompetitive policy "or maintaining an action to enforce a restrictive" policy, whereas subsequent "implementation is only a reaffirmation of the policy's adoption . . ." *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 270 (8th Cir. 2004).

Under the same rules, the plaintiffs' claim is not subject to either of the two recognized exceptions to laches in an antitrust case, *i.e.*, for "continuing violations" or uncertainty of damage.[40]  For the continuing conspiracy or continuing violation exception, the period begins to run with the act that causes the alleged injury rather than each time the plaintiff suffers the injury.[41]

> "The focus is on the timing of the causes of injury, i.e., the defendant's overt acts, as opposed to the *effects* of the overt acts." "The fact that injuries have a rippling

---

[40]  *Oliver*, 751 F.3d at 1085.

[41]  "[T]he continuing conspiracy or continuing violation exception . . . permits a cause of action to accrue whenever the defendant commits an overt act." *Kaiser Aluminum*, 677 F.2d at 1051 (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338-40 (1971), and *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 501 n. 15 (1968)); *accord Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 598 (6th Cir. 2014).

> effect into the future only establishes that plaintiffs might have been entitled to
> future damages."

*In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 902 (emphasis original; citations, brackets, and ellipses omitted).  The continuing violation exception does not allow a plaintiff to "salvage an otherwise untimely claim by asserting that it continues to lose revenue because of past alleged anticompetitive conduct."  *Id.*

"In order to restart the statute of limitations, there must be a new overt act that: (1) is new and independent and not merely a reaffirmation of a previous act, and (2) inflicts new and accumulating injury on the plaintiff."  *Oliver*, 751 F.3d at 1086 (brackets, ellipse, and internal quotation marks omitted).  Antitrust law draws a "distinction between new and independent acts that inflict new and accumulating injury on the plaintiff (which restart the statute of limitations), and unabated inertial consequences of previous acts (which do not)."  *Midwestern Mach. Co.*, 392 F.3d at 271 (citation, brackets, ellipse, and internal quotation marks omitted).  Thus, "Only where the monopolist actively reinitiates the anti-competitive policy and enjoys benefits from that action can the continuing violation theory apply."  *Id.*

"The second [exception] involves situations where the defendant's antitrust act is 'revived' outside the limitations period, *as a basis for damages*, because when the act originally occurred, the plaintiff's damages were speculative or unprovable."  *Kaiser Aluminum*, 677 F.2d at 1051 (emphasis added).  However, the plaintiffs here are not seeking damages.  For purposes of laches, on an antitrust claim for injunctive relief, this exception is triggered not by uncertainty as to the *amount* of damages but as to *whether* the plaintiff has been damaged.  *Oliver*, 751 F.3d at 1086 ("the limitations period may start to run after the defendant's initial violation of the antitrust law, if it is 'uncertain' or 'speculative' *whether the defendants' antitrust violation has injured the*

*plaintiff* at the time of the violation") (emphasis added). The plaintiffs' pleadings allege specific injury from the inception of "New Rule 174." Doc. 55 ¶¶ 100-02.

### B. The Plaintiffs' Section 1983 Claim Attacking "New Rule 174" is Time-Barred.

To the extent, if any, that it is aimed at sec. 174,[42] the plaintiffs' dormant Commerce Clause claim under 42 U.S.C. § 1983 is also time-barred. Section 1983 incorporates the forum state's limitations period for personal injury actions, which in Texas is two years. *Price v. City of San Antonio*, 431 F.3d 890, 892-93 (5th Cir. 2005). But "federal courts look to federal law to determine when a civil rights action accrues." *Harris v. Hegmann*, 198 F.3d 153, 157 (5th Cir. 1999). "Ordinarily, a cause of action under section 1983 accrues when the plaintiff 'knows or has reason to know of the injury which is the basis of the action.'" *Price*, 431 F.3d at 393.

"Absent unusual circumstances not present in this case, the rule is that accrual occurs when a plaintiff has 'a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief.'" *Frame v. City of Arlington*, 657 F.3d 215, 238 (5th Cir. 2011) (en banc) (footnote omitted). "Under federal law, the statute of limitations under § 1983 begins to run 'the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured.'" *Edmonds v. Oktibbeha County*, 675 F.3d 911, 916 (5th Cir. 2012).

The plaintiffs' pleadings show that they were aware of the alleged injury they attribute to "New Rule 174" well before April 29, 2013. Doc. 55 ¶¶ 100-02.

---

[42] The plaintiffs' "Count II" specifically identifies only § 190.8 ("actions detailed above, including the revision of Rule 190.8"), but incorporates all the preceding paragraphs, including the allegations complaining of "New Rule 174." Doc. 55 ¶¶ 158, 160.

## CONCLUSION

In view of all the foregoing, the defendants respectfully urge that all of the plaintiffs' claims against them be dismissed, that they recover their costs, and that they be awarded any additional relief to which they show themselves entitled.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

ANGELA V. COLMENERO
Division Chief – General Litigation Division


 /s/   *James C. Todd*
JAMES C. TODD
Texas Bar No. 20094700
SEAN FLAMMER
Texas Bar No. 24059754
Assistant Attorneys General
Office of the Attorney General
General Litigation Division-019
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120; (512) 320-0667 FAX
Jim.Todd@texasattorneygeneral.gov
Sean.Flammer@texasattorneygeneral.gov

ATTORNEYS FOR DEFENDANTS

39

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been filed electronically with the Court on this the 30th day of July, 2015, which will provide a copy to:

James Matthew Dow
JACKSON WALKER L.L.P.
100 Congress Avenue, Suite 1100
Austin, Texas 78701
(512) 236-2000 (Telephone)
(512) 236-2002 (Facsimile)
*ATTORNEYS FOR PLAINTIFFS*

George S. Cary
Leah Brannon
Drew Navikas
CLEARY   GOTTLIEB   STEEN   &
HAMILTON
2000 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 974-1500 (Telephone)
(202) 974-1999 (Facsimile)
*ATTORNEYS FOR PLAINTIFFS*

 /s/   *James C. Todd*                          
JAMES C. TODD
Assistant Attorney General